David Ray Duren appealed from the denial of his Rule 20, A.R.Crim.P.Temp., petition for relief from his conviction of capital murder and sentence of death. The Court of Criminal Appeals affirmed. 590 So.2d 360. On certiorari review he contends that he was denied effective assistance of counsel during his trial and during his sentencing hearing.
In 1984, Duren was convicted of the October 20, 1983, robbery and murder of Kathleen Bedsole. On appeal, the Court of Criminal Appeals remanded the case to the trial court for the entry of specific written findings of fact relating to the punishment phase of the trial; on return to remand on October 14, 1986, that court affirmed Duren's conviction, and it denied rehearing on November 12, 1986, Duren v. State, 507 So.2d 111
(Ala.Cr.App. 1986); and this Court affirmed his conviction on April 10, 1987, Ex parte Duren, 507 So.2d 121 (Ala. 1987). The United States Supreme Court denied certiorari. Duren v.Alabama, 484 U.S. 905, 108 S.Ct. 249, 98 L.Ed.2d 206 (1987). Duren filed with the Jefferson Circuit Court a petition for Rule 20, A.R.Crim.P.Temp., relief, which that court denied. On August 24, 1990, the Court of Criminal Appeals affirmed that denial.
The Alabama Court of Criminal Appeals listed the facts surrounding the murder, as shown in the trial court's findings of fact, as follows:
 "The victim in this case, Kathleen Bedsole, and her companion, Charles Leonard, were on a date on October 20th, 1983, and had left the victim's home at approximately 9:00 p.m. with the intention of going to visit some haunted houses sponsored by radio stations in the Birmingham area, as this was in the Halloween season.
 "Sometime after leaving the victim's home, the couple had parked at a location in the Huffman area and, according to testimony of witness Charles Leonard, had been there some five to ten minutes prior to two individuals coming up to the car. One of the individuals was armed with a pistol and was identified by witness Leonard as being the defendant, David Ray Duren. The two individuals instructed the victim and her companion, Charles Leonard, to get out of the car and, further, that, if they did as they were instructed, they would be okay.
 "The victim, Kathleen Bedsole, and her companion, Charles Leonard, were subsequently placed in the trunk of the automobile, and the car drove from that location. The witness Leonard testified that on being placed in the trunk that the car traveled for a short distance and stopped. He heard one of the car doors open and, after a short time span, close, and the car proceeded on. After traveling a short distance, the car appeared to get on an interstate highway and traveled for some length of time. On exiting the interstate, the car shortly thereafter entered what appeared to be a drive-in restaurant, and a conversation was overheard between one of the two defendants and an employee of the restaurant. Only a few words were heard, but one of them appeared to be an exclamation shouted by one of the restaurant employees of the word, 'robbery.' Immediately thereafter, the car sped away from the location.
 "The car again drove for some distance and appeared to get back on an interstate and drove to a location in the eastern section of Jefferson County known as Trussville. The car drove to a secluded location wherein the victim, Kathy Bedsole, and her companion, Charles Leonard, were taken from the trunk of the car. The second defendant, later identified as Richard David Kinder, tied the victim and her companion together with a length of rope, and after being tied together, the defendant Kinder retrieved the purse belonging to the victim and removed from said purse two twenty dollar bills which had previously been given to the victim by her father prior to her leaving her home.
 "After a brief conversation between the defendant, David Duren, and Richard David Kinder, the defendant Kinder turned the victim and her companion in a position where the victim, Kathy Bedsole, *Page 371 
was facing away from the defendant David Duren. At this time the defendant Duren raised the pistol which he had had in his possession and fired one shot, which appeared to strike the victim Bedsole. On firing the shot, the victim Bedsole fell with her companion, Charles Leonard, landing on top of her, as they were still tied together. At this time defendant David Duren aimed the pistol at Charles Leonard and fired approximately four times with three of the shots hitting the witness Charles Leonard in the chest and the legs. After defendant David Duren quit shooting, he and codefendant Richard Kinder left in the victim Charles Leonard's car.
 "Shortly thereafter, the witness Charles Leonard was able to free himself from the rope binding him with the victim Kathy Bedsole, and he walked to a location where he was able to gain assistance and call the sheriff's office for further assistance. When interviewed by the sheriff's deputy answering the call and after ascertaining from witness Leonard as to what had transpired, a radio transmission was then sent and subsequently received by another deputy sheriff who later observed defendants Duren and Kinder walking along a public roadway in the Roebuck/Huffman area. On questioning the individuals and observing their appearance, they were later taken into custody, and on subsequent questioning by Detective Sgt. M.E. White, made a statement admitting their participation in this crime.
 "Further testimony by Dr. Robert Brissie established the cause of death of the victim, Kathy Bedsole, as being the result of a small caliber distant gunshot wound to the back of the brain."
Duren v. State, 507 So.2d at 113-14.
During the trial of the case, Duren's sole "defense" was that he had meant to kill Charles Leonard instead of Kathleen Bedsole. Because Alabama recognizes the theory of transferred intent, that was not a defense. Duren was found guilty of a capital offense involving the robbery and intentional murder of Kathleen Bedsole, Ala. Code 1975, § 13A-5-40(a)(2), and was sentenced to death.
Duren contends that he was denied effective assistance of counsel during his trial and during his sentencing hearing.Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,80 L.Ed.2d 674 (1984), sets out the standard of proof required in an ineffective assistance of counsel claim. In that case, the United States Supreme Court states:
 "A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."
Strickland, 466 U.S. at 687, 104 S.Ct. at 2064.
In Ex parte Womack, 541 So.2d 47 (Ala. 1988), this Court discussed the applicability of Strickland to ineffective assistance of counsel claims in Alabama. That case stated:
 "The first prong of the Strickland test is that 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.' 466 U.S. at 688, 104 S.Ct. at 2064. The court explained that this prong of the test does not impose specific guidelines but rather implies fulfillment of the basic duties of the attorney, to assist the client and to be a loyal advocate of the client's position. Likewise, the Supreme Court explained that an attorney has a duty to 'bring to bear such skill and knowledge *Page 372 
as will render the trial a reliable adversarial testing process.' 466 U.S. at 688, 104 S.Ct. at 2065, citing Powell v. Alabama, 287 U.S. [45] at 68, 53 S.Ct. [55] at 63 [77 L.Ed. 158 (1932)]. 'Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial.' 466 U.S. at 689, 104 S.Ct. at 2065.
 "The Court went on to explain that judicial scrutiny of counsel's performance must be highly deferential, avoiding the lure of 20/20 hindsight, and must adopt counsel's perspective at the time of trial. '[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' 466 U.S. at 689, 104 S.Ct. at 2065. Because of the diverse methodologies employed by defense counsel and the broad range of opinion about how to best address a particular situation, the burden is upon the defendant to overcome the presumption that the challenged action constitutes 'sound trial strategy.' Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83
(1955). The court must determine whether,
 " 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in that particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'
"Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.
 "The second prong of the Strickland analysis requires a showing that counsel's deficiencies resulted in prejudice to the defense. The Court explained that the burden is to show actual prejudice and not merely that particular errors or omissions were unreasonable.
" '. . . .'
 ". . . The question is whether 'there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [466 U.S. at 694, 104 S.Ct. at 2068.] Such a consideration necessarily assumes that the decision maker is reasonable and impartial and conscientiously applies the proper standard, the Court noted."
Ex parte Womack, 541 So.2d at 66-67.
 INEFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL
Duren contends that he was denied effective assistance of counsel during his trial because Roger Appell, his attorney, presented a legally invalid defense rather than a legally valid defense based on intoxication.
Duren contends that Appell violated Disciplinary Rule 7-102, Code of Professional Responsibility of the Alabama State Bar (rescinded effective January 1, 1991, when the Rules of Professional Conduct became effective), which read:
 "(A) In his representation of a client, a lawyer shall not:
". . . .
 "(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law."
In Strickland, the United States Supreme Court stated:
 "Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can *Page 373 
satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. See United States v. Decoster, 199 U.S.App. D.C. [359], at 371, 624 F.2d [196], at 208 [(1976)]."
Strickland, 466 U.S. at 688-89, 104 S.Ct. at 2065.
Appell testified at the Rule 20 hearing that, after considering the prosecution's strong case against Duren, which included the facts that there was an eyewitness identification of Duren as the one who had committed the murder and that Duren had confessed to the murder on two separate occasions, he felt that he did not have a legally valid defense available. Appell further testified that he had hoped to persuade the jury that Duren did not have the specific intent to kill Kathleen Bedsole and therefore was guilty of murder rather than capital murder. Appell testified that if the jury, despite instructions from the judge on the invalidity of transferred intent as a defense, had believed him about Duren's actual intent and returned a verdict of guilty of murder rather than guilty of capital murder, it would have been in the best interest of his client to present the case in that light.[1]
The trial court made the following findings in regard to this issue:
 "When he made this argument, Appell knew that, due to the doctrine of transferred intent, this was not a legally valid defense. Appell presented this defense for several reasons. First, it had been raised by Duren in his confession. Second, after investigation, Appell knew that the prosecution's case was overwhelming and Duren's chances of acquittal or conviction of a lesser included offense were extremely small. Third, Appell knew that, even if this position was not a valid legal defense, a verdict based on this defense would still benefit Duren.
 "Appell's decision was not unreasonable. The prosecution's case was overwhelming. Appell had rejected intoxication as a defense because he thought Duren's claim was not credible and that such a defense would only prejudice a jury against his client."
We agree with the trial court that Appell's decision was not unreasonable under all the attendance circumstances; consequently, we agree that Duren has not shown that counsel was ineffective in this regard. He was trying to make the most of a bad situation for his client.
In Strickland, the United States Supreme Court held:
 "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. . . . And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable."
Strickland, 466 U.S. at 691, 104 S.Ct. at 2066.
Appell testified at the Rule 20 hearing that Duren had told him that he had taken the drug LSD on the day of the murder, but Appell also testified that Duren did not appear to believable on this point. Appell further testified that he wanted to present Duren as very believable and remorseful for what had happened. Above all, Appell testified, he wanted the jury to feel sympathy *Page 374 
toward Duren. Appell testified that he did not think that informing the jury that Duren may have been intoxicated on the day of the murder would be beneficial in his strategy to have the jury feel sympathy toward Duren.
We cannot say that Appell was unreasonable in choosing to handle Duren's trial in the way he did. We certainly cannot say that there is a reasonable probability that the result of the trial would have been different had Appell presented a defense other than the one he chose to present. Therefore, we hold that Duren did not receive ineffective assistance of counsel at his trial.
 INEFFECTIVE ASSISTANCE OF COUNSEL AT THE SENTENCING HEARING
Duren also contends that Appell rendered ineffective assistance of counsel during his sentencing hearing. Duren asserts that Appell should have presented evidence of intoxication, substance abuse, and mental disorders as mitigating factors to be considered during his sentencing.
In Strickland, the United States Supreme Court held:
 "A capital sentencing proceeding like the one involved in this case . . . is sufficiently like a trial in its adversarial format and in the existence of standards for decision . . . that counsel's role in the proceeding is comparable to counsel's at trial — to ensure that the adversarial testing process works to produce a just result under the standards governing decision. For purposes of describing counsel's duties, therefore, Florida's capital sentencing proceeding need not be distinguished from an ordinary trial."
Strickland, 466 U.S. at 686-87, 104 S.Ct. at 2064. Therefore, we must consider Appell's conduct at the sentencing hearing in the same manner as we would consider it at trial. In other words, we must determine whether Duren has shown that the results of the sentencing hearing probably would have been different if Appell had presented evidence of Duren's drug, alcohol, and psychological problems as mitigating factors.
Appell testified at the Rule 20 hearing that he had talked with Duren and Duren's family many times in trying to determine what was the best approach to take at both Duren's trial and his sentencing hearing. Appell testified that he decided that a "mercy" approach would be the best way to present Duren to the jury. Using this approach, Appell prepared Duren to testify that he knew that what he had done was wrong and that he was very sorry for what had happened. In addition, Appell prepared Duren's aunt to testify concerning Duren's traumatic childhood. In taking this approach, Appell testified that he hoped that the jury would show mercy to Duren and sentence him to life without parole rather than sentence him to death. Appell further testified that he felt that if he introduced into evidence the testimony of a psychologist that had examined Duren, all hope would be lost. Appell testified about the psychologist's report and how he thought it would affect Duren's trial and sentencing hearing:
 "He [the psychologist] told me that David was a walking time bomb. He told me that in his opinion David was ready to explode, and if it hadn't been Kathy Bedsole it was going to be somebody else. That he was capable of killing again. And that is basically what I remember. And at that point I didn't believe that he fell within the definition of insanity for the guilt or punishment stage, and I was afraid that if Dr. Bair testified to that or if that was asked during the sentencing phase that there would be no hope. And at that point I had no more funds to try to seek another —"
Appell was also aware of the fact that he had no way of proving that Duren was intoxicated other than Duren's statement that he had taken LSD on the day of the murder. As previously stated, Appell felt that that statement was not believable.
Under the Strickland test, a defendant has the burden of proving that, but for the ineffectiveness of his counsel, the outcome of his sentencing hearing probably would *Page 375 
have been different. Duren has failed to meet that burden.
AFFIRMED.
HORNSBY, CJ., and SHORES, ADAMS, HOUSTON, STEAGALL and INGRAM, JJ., concur.
[1] Appell testified as follows:
"A. I don't remember if that is the way I phrased it. But basically I was trying to convince the jury that it was a murder case, not a capital murder, there was no intent to kill the young woman that died.
"Q. As part of that it was your strategy to try to convince the jury that it was his intent to kill another victim, is that right?
"A. Well, I didn't know whether — sort of, I guess that is right, but basically my intent was to convince the jury that he had no intent to kill the specific person that was killed, and therefore it wasn't a capital murder case, it was a murder case."