793 So.2d 870 (2000)
Geoffrey Todd WEST
v.
STATE.
CR-98-1956.
Court of Criminal Appeals of Alabama.
June 30, 2000.
Opinion on Return to Remand August 25, 2000.
Rehearing Denied October 20, 2000.
Certiorari Denied February 23, 2001.
*873 Charles C. Hart, Gadsden; and William R. Willard, Gadsden, for appellant.
Bill Pryor, atty. gen., and Michael B. Billingsley, asst. atty. gen., for appellee.
Alabama Supreme Court 1000231.
BASCHAB, Judge.
The appellant, Geoffrey Todd West, was convicted of capital murder for the killing of Margaret Parrish Berry. The murder was made capital because the appellant committed it during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 10-2, that the appellant be sentenced to death. The trial court accepted the jury's recommendation and sentenced the appellant to death. The appellant filed a motion for a new trial, which the trial court denied after conducting a hearing. This appeal follows.
Because the appellant does not challenge the sufficiency of the evidence to support his conviction, a lengthy statement of the facts of the case is not necessary. However, we have reviewed the evidence, and we conclude that it is sufficient to support the appellant's conviction. In its sentencing order, the trial court summarized the relevant facts of this case as follows:
"In the late hours of March 27, 1997, or early morning of March 28, 1997, Geoffrey Todd West and his girlfriend drove to Harold's Chevron located at 2920 Noccalula Parkway. The Defendant had previously been employed at this convenience store. The Defendant previously had expressed to others his intention to rob the Chevron Store and to `leave no witnesses,' `kill the person up there.'
"West entered the store armed with a.45 caliber handgun and the circumstances indicate that he held the attendant Berry at gunpoint and took $250.00 from a cookie can where the store money was kept. The medical evidence indicates that Berry was shot in the back of the head while lying prone on the floor behind the counter of the store. According to the medical examiner, the `wound would cause rapid incapacitation and a very rapid death.'"
(C.R.188.)
The appellant raises several issues on appeal that he did not raise at trial. Although the lack of an objection at trial will not bar review of an issue in a case in which the death penalty has been imposed, it will weigh against any claim of prejudice the appellant may raise. See Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. *874 denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Rule 45A, Ala. R.App. P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).

I.
The appellant's first argument is that the trial court improperly refused to exclude from evidence letters he allegedly wrote to his former girlfriend and codefendant, Amy Pearce, because the prosecution made the defense aware of the existence of the letters only eight days before the trial was scheduled to begin. Additionally, he argues that the trial court should have excluded the testimony of the prosecution's expert because the prosecution first gave the defense notice of its intent to introduce that expert testimony on May 20, 1999. Specifically, he contends that he should not have been deprived of an opportunity to review and respond to the documents and the expert's testimony simply because the prosecution procrastinated in preparing its case. Finally, the appellant argues, in the alternative, that the trial court should have granted a continuance so the defense could retain its own expert to examine the letters. Although he moved to suppress or exclude the letters and the expert's testimony, he did not request a continuance. Therefore, we review the appellant's contention about the continuance for plain error. See Rule 45A, Ala. R.App. P.
During a motion hearing on May 19, 1999, the following occurred:
"DEPUTY DISTRICT ATTORNEY PHILLIPS: ... I found outI don't know the exact datebut either on Thursday [May 6, 1999] or Friday [May 7, 1999] from talking to Ms. Pearce's attorney she informed me for the first time that they had some letters that they had not told us about or that we had.
"THE COURT: All right. When was this?
"DEPUTY DISTRICT ATTORNEY PHILLIPS: Thursday or Friday before the Wednesday [May 12, 1999] that I turned them over. We still did not have them in our possession.
"THE COURT: Okay.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: Ms. Pearce is at another jail facility. She is not here in the county. They had requested and we agreed that before we talked to her at any time we would contact them and they would meet us at that facility and her attorney is there, and I have never spoken to the lady when her attorney wasn't present. We made arrangements to meet her on Monday. That would have been what, the 10th, at 2:00 o'clock in the afternoon 2:00 o'clock in the afternoon at Blount County. We showed up over there at approximately 4:30 or 5:00 o'clock on Monday afternoon was when those letters first came into our possession. And it is not just a sheet or two. It is a stack approximately four to six inches tall. And it was nothingthey just said basically `here they are.' These were letters that were mailed that were written by the defendant.... *875 They turned those letters over to us that day at approximately 5:00 o'clock on the 10th. I had an uncle that died and I went to the funeral and stayed out from work on the 11th. As soon as I got home, I spent about six hours going through the letters. I was the first one to read them. [The other prosecutor] didn't have them. Wednesday morning when I got back to work I called and told John about them and they were turned over that day, the 12th."
(R. 174-76.) During a break in the voir dire proceedings on May 20, 1999, the following occurred:
"MR. FLOYD [defense counsel]: Judge, I don't know when we are going to need to take this up, but there is going to be an issue regarding some forensic testing that has been ongoing that we are just now getting any results of.
"THE COURT: Well, we don't need to do that before we get through with the jury, do we?
"MR. FLOYD: This is the problem we run into, Judge. This is expert forensic testing and if they come up with something that is adverse to our client, we are not going to have the opportunity to respond. We don't have the opportunity to get an expert. We don't have the opportunity to do anything with this evidence.
"THE COURT: Okay.
"MR. FLOYD: This is handwriting evidence. We would have to have a handwriting expert and all of that, and we are in a situation now where today we are here to strike a jury and as we are taking breaks in between, we are getting bits and pieces of what is purported to be in the letters. I can't see how we can be adequately prepared to defend the case when we get something on the eve of picking the jury. How can the court allow the State to bring in evidence of something that comes up the day we are striking the jury?
"THE COURT: I don't know anything about what you are talking about. I have no idea.
"MR. FLOYD: There are certain portions of the letters that have been previously referred to in this case that are purportedly written by the defendant to the codefendant who is now going to testify in this case. There were certain portions of those letters that [have] been deleted by the codefendant who will be the witness to testify.
"THE COURT: Uh-huh.
"MR. FLOYD: She has deleted those purposely, marked through those areas. Now, those letters were in the possession of the State on May 12th. No, they were in possession of the State on May 10th. The State knew of them on May 4th. I think it was the Thursday before is when they had informed the court. Well, excuse me, the 6thMay 6th is when they became aware of the letters. The letters came into our possession actually the morning of the 13th of May. Copies were provided the morning of the 13th.
"DEPUTY DISTRICT ATTORNEY WARREN: The 12th.
"MR. FLOYD: No, it was the 13th. We found out about them on the 12th.
"THE COURT: I thought we had already hashed all that out.
"MR. FLOYD: Yes, sir. But what had come to light now is they have certain of these letters that have these deletions in them to the Department of Forensic Science to have a handwriting expert or an expert who is in some particular field
"DEPUTY DISTRICT ATTORNEY WARREN:A document

*876 "MR. FLOYD:To try to read what is underneath the deleted portions of the letters. And the first time we hear of this, they mentioned yesterday there was some forensic testing ongoing but didn't go into detail about what it was. This morning they come to us and tell us they have been trying to lift what is underneath these deleted portions of the letters. As the morning proceeded on two separate occasions we have been given bits and pieces of what is supposedly underneath the deletions in the letters. How can we be in a position to adequately respond to something an expert is going to come in here and testify about when we don't even know about until the day we are fixing to strike a jury.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: They have had the letters with the exception of about 36 hours ever since we have and there is no reason why they couldn't have had any expert do whatever they wanted to as well.
"MR. FLOYD: We have had the letters since the morning of May 13th, Judgeseven days.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: You have had them since
"MR. FLOYD: May 13th.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: I recall you got them May 12th. Y'all came over that afternoon.
"MR. WARD [defense counsel]: We came over and
"DEPUTY DISTRICT ATTORNEY PHILLIPS:You were informed you could get them on the 12th. Why you didn't come and get them is your problem.
"MR. WARD: That's not true. It was on the 13th when Kim was making them. I was up here on the 13th when Kim was making them.
"THE COURT: Well, whatever, we are talking about 24 hours. Time out. When did y'all start this business of getting an expert? After what date?
"DEPUTY DISTRICT ATTORNEY PHILLIPS: We didn't find out that we even had anyone that could do that until Tuesday [May 18, 1999].
"THE COURT: Two days ago?
"DEPUTY DISTRICT ATTORNEY WARREN: Yes.
"THE COURT: All right. So y'all started two days ago to try to lift off
"DEPUTY DISTRICT ATTORNEY WARREN:No sir, we are not lifting it off. They are reading through.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: They put a light source under it. [Deputy District Attorney Warren] saw the process yesterday. I don't know. Explain how they do it.
"THE COURT: Okay.
"DEPUTY DISTRICT ATTORNEY WARREN: Judge, what we have is a letter written in blue ink that was over-marked by the codefendant in black ink and felt tip marker, and they use a directional light source to read through the overmarking. That's what they have been doing.
"THE COURT: So y'all started that two days ago?
"DEPUTY DISTRICT ATTORNEY WARREN: Yes, sir.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: Right.
"THE COURT: All right. Can y'all make these letters available to an expert of the defense's choosing so he will have the same two days? That will give you three.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: They have got copies of them.

*877 "THE COURT: Is this case going to go through next Wednesday or Thursday?
"MR. FLOYD: And the court will approve whatever expense it costs?
"THE COURT: If we have got somebody available I need to know what that is going to be first. If we have got to bring somebody from Fairbanks, Alaska 
"MR. FLOYD:We are going to have to ask somebody to work on Saturday and Sunday, Judge
"THE COURT:If we are going to have to bring somebody from FairbanksI'm sorry. I didn't mean to interrupt you. If we have got to bring somebody from Fairbanks, Alaska, and it is going to cost $10,000, that is one thing, but if you can find somebody available that can do it within reason, then, yes.
"MR. WARD: We will need the original, Judge. We haven't got
"MR. FLOYD: We have got to have the original.
"DEPUTY DISTRICT ATTORNEY WARREN: Absolutely they have to have the original in order to do that. As far as I know, the originals are on their way back from Birmingham at this time.
"THE COURT: Okay.
"MR. FLOYD: We have never had the originals.
"THE COURT: It took them two days to get their expert and information. I will make sure you get at least two days and it looks like three or four.
"DEPUTY DISTRICT ATTORNEY WARREN: I understand from our expert that if you can get to the folks in Georgia with the machine, they can do it in about 30 minutes and provide everybody with copies of it.
"THE COURT: Okay. Very good. Anything else? Okay. I will see y'all at 1:30."
(R. 264-70.) On May 21, 1999, during another break in the voir dire proceedings, the following occurred:
"DEPUTY DISTRICT ATTORNEY PHILLIPS: ... I guess we ought to put on record with regard to those letters. If the defense wants them, the originals are back in our possession. We got them back yesterday. We will make them available to any expert that they want to. We would like to have some kind of protective order so that you know, to make surethese are originals that either a copy shall be introduced in their stead or whether they would come back into our possession when whatever they want done won't be altered or anything.
"MR. FLOYD: Judge, at this point I mean what the court said the other day, the court is going to afford us the opportunity to try to find someone that can testify on our behalf as an expert in regards to the documents and the, I guess, the obliterations that have been or attempted to be read under. I tried yesterday during lunch to begin tracking down someone that might be in a position to do that and have not been able to speak with anyone yet. As the court is aware, we were here until after five and the only people that I have and names I have available work out of Georgia. So it was after six when I was able to try to call back. I did not have any calls back. The only problem that I foresee running into is the short period of time involved in us being able to obtain anyone to do that. And even if we are able to find someone that can actually test the documents and see what is actually under the obliterations, we still have the problem in gaining the ability for them to come *878 and testify on behalf of the defendant. And as to cost, or expense associated with that, I have no idea because I have not spoken to anybody directly. So that's the problem that we run into from the defendant's standpoint.
"THE COURT: I have already told you that we would pay within reason for whoever you get.
"MR. FLOYD: I realize that. Locating someone is the problem, Judge.
"THE COURT: The State got it in two daysgot somebody to do it. Now, you make your best effort, but the only thing I want to do is make sure that however we handle whoever we are going to get it to, that weyou don't come back and object on some kind of chain of custody of this document or whatever you
"MR. FLOYD:They had someone from the Alabama Department of Forensic Sciences perform these tests.
"THE COURT: Well, I have tried many cases over the years and there are all kinds of handwriting experts all over the place.
"MR. FLOYD: I realize that, Judge. This is not handwriting, Judge. This is a document expert that analyzes documents as opposed to a handwriting expert.
"THE COURT: Do your best effort and we will be glad to pay for it and we will give you as much time as the State has had to do it.
"DEPUTY DISTRICT ATTORNEY PHILLIPS: John, if you want my number at home if you find someone over the weekend, I will be at home, or [Deputy District Attorney Warren] either one, we will come down and give it to you."
(R. 540-42.) On May 24, 1999, before the trial began, the following occurred:
"THE COURT: Well, have you had an opportunity to review these letters, look at the letters?
"MR. FLOYD: We have seen photostatic copies of the letters that were provided to us on the 13th of May of this year. We have attempted to find us someone to also, as a documents expert, that the State has, and it is my understanding that the documents expert from them [has] reviewed the letters and has issued a report that we were provided on Friday, last Friday, the 21st of May. Well, partsit may have been the 20thit may have been Thursday. It was Thursday that we were provided the report, yes, sir, Judge, it was. The report tends to reveal or, I guess, purports to reveal what is under some obliterations on these letters. The court We brought this up, I believe, at lunch break on May 20th questioning as to whether or not or even if we had the capability to do that. I tried on, well, after we got finished on Thursday, I was unable to contact anyone because the only people I was aware of or ever had any information on were out of Atlanta. We didn't get finished here until 5:30 central time. So it would have been 6:30 in Atlanta. I was unable to contact anybody on Thursday. We were here all Friday morning and after we finished it, I tried to make further contact; was able to contact one person's office, not speak directly with that person. I was informed by the secretary or appointment, whoever was handling the matter, that there was no way he could be available to testify during the following week, and in order to havehe would have to have the documents in hand and whether or not the testing and results could be available in time for trial today was very doubtful. So we have been unable to locate anyone to analyze the documents to testify as an expert on behalf of the *879 defendant. It puts us at a very uneasy position because we are going on the basis of someone who is going to come in and say, `Well, I was able to analyze it and this is how I did it,' and we have no way to respond. We have no one that can analyze if from the defendant's standpoint. And I realize the court said, `You can have two days like the State did.'
"THE COURT: No, I am letting y'all have from last week through the end of the trial for that matter.
"MR. FLOYD: Well, I understand that, Judge. I understand that and I understand the documents are available for us to have and to take to an expert. The problem we have got is I cannot locate an expert who, on such short notice, can be available to analyze the documents, drop what he is doing, analyze our documents, and be available to testify in this trial which is to begin today.
"THE COURT: Well, let me ask you something. This obliteration business, is this expert going to come in and interpret the verbiage that is obliterated and affirmatively say to the jury `all this scroll looking stuff here says so and so, so and so, and so and so,' or is the jury going to be able to view something that they can decide on their own?
"DEPUTY DISTRICT ATTORNEY WARREN: Partially the jury can make it out themselves. Partially you can make it out. I can make it out."
(R. 557-60.)
The prosecution made the letters available to the defense on May 12, 1999, less than two days after it received them from Pearce. On May 19, 1999, the day after it located an expert, Steven Drexler, the prosecution informed the defense that Drexler was examining the letters. Over the next two days, May 20-21, 1999, the prosecution provided to the defense the substance of Drexler's expected testimony, including the report he prepared. Thus, contrary to the appellant's assertion, the prosecution promptly notified the defense about the letters and Drexler's expected testimony. See Brown v. State, 545 So.2d 106 (Ala.Crim.App.1988), aff'd, 545 So.2d 122 (Ala.), cert. denied, 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 206 (1989). Therefore, the trial court did not err in refusing to exclude the letters and Drexler's testimony.
Furthermore, because Drexler did not testify until May 26, 1999, the defense had the letters for approximately fourteen days before he testified and had his report for approximately five days before he testified. "`"A motion for [a] continuance due to lack of time for adequate preparation is a matter entirely and exclusively within the sound discretion of the trial court and its ruling will not be reversed on appeal absent a plain and palpable showing of abuse." Reynolds v. State, 539 So.2d 428, 429 (Ala.Cr.App. 1988).' Baker v. State, 683 So.2d 1, 5 (Ala.Cr.App.1995)." Boyd v. State, 715 So.2d 825, 837-38 (Ala.Crim.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998). The appellant has not alleged or shown how he would have benefitted from a continuance. See Boyd, supra; Prince v. State, 623 So.2d 355 (Ala.Crim.App.1992). Accordingly, we do not find any plain error in this regard.

II.
The appellant's second argument is that the prosecution did not establish that Drexler's testimony about the reconstruction and interpretation of obliterated portions of the letters was admissible under Frye v. United States, 293 F. 1013 (D.C.Cir.1923), or Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 *880 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In Turner v. State, 746 So.2d 355, 361 n. 7 (Ala.1998), the Alabama Supreme Court noted:
"With respect to expert scientific testimony on subjects other than DNA techniques governed by § 36-18-30, Frye remains the standard of admissibility in Alabama. See Hoosier v. State, 612 So.2d 1352 (Ala.Crim.App.1992); Rivers v. Black, 259 Ala. 528, 68 So.2d 2 (1953)."
Furthermore, for the reasons set forth below, we conclude that Drexler's testimony did not constitute novel scientific evidence and that therefore the Frye test did not govern its admissibility.
Drexler, an expert in the analysis of handwriting and questioned documents, testified that he used several techniques to decipher writing that had been obliterated in portions of the above-referenced letters. First, he used magnification with available lighting. Second, he used a higher magnification with more intense lighting. Third, he used different wavelengths of light to try to see through the obliterations. Finally, he applied acetone to try to dissolve obliterations that had been made with a felt tip marker. He explained that the original writing was not soluble in acetone and that he had not altered it in any way. Finally, Drexler testified that he basically just read the words that were under the obliterations.
We addressed a similar situation in Stewart v. State, 601 So.2d 491, 499 (Ala. Crim.App.1992), aff'd. in part, rev'd in part on other grounds, 659 So.2d 122 (Ala.1993), aff'd, 730 So.2d 1246 (Ala.), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999), as follows:
"The appellant further argues in his reply brief that the results of the lumalite test should not have been shown to the jury because it is a new scientific test and no expert at trial testified to its general acceptance and reliability in the scientific community. Essentially, the appellant maintains that there was no testimony concerning the steps articulated in Frye v. United States, 293 F. 1013 (D.C.Cir.1923), regarding novel scientific evidence.
"After considering the expert description of the luma-lite test, we believe that the Frye case does not apply. `In Ex parte Dolvin, 391 So.2d 677 (Ala.1980), the court specifically held Frye to be inapplicable when expert evidence is in the nature of physical comparisons as opposed to scientific tests or experiments.' Handley v. State, 515 So.2d 121, 130 (Ala.Cr.App.1987).
"The luma-lite test performed in this case does not deal with comparing scientific data or experiments such as deoxyribonucleic acid (DNA) testing or voice print analysis. See Ex parte Perry, 586 So.2d 242 (Ala.1991), and Frye, supra. Nor does the luma-lite test deal with any physical comparisons such as the dental comparisons involved in Handley and Dolvin. The luma-lite test, from our evaluation of its description, involves the spraying of chemicals onto an object and the photographing of the chemical reaction with a camera. In essence, it aids the jury in seeing something that was already there but that was enhanced with the aide of the luma-lite. The Frye test is inapplicable to the test in the present case and the lack of expert testimony as to the factors articulated in Frye was not error. See Dolvin, supra."
Similarly, Drexler simply used lighting and magnification or chemicals to aid in seeing writing that was already on the letters. Therefore, the Frye test did not govern the admissibility of Drexler's testimony.
*881 The proper standard for determining the admissibility of Drexler's testimony is set forth in Rule 702, Ala. R. Evid., which provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
In this case, Drexler used his knowledge of lighting and magnification or chemical solubility to read portions of letters that had been obliterated. Many of those obliterated portions implicated the appellant in the commission of the capital offense. Therefore, Drexler's testimony was properly admissible under Rule 702, Ala. R. Evid.
Moreover, Amy Pearce testified that she had obliterated portions of the letters because they incriminated the appellant. Therefore, error, if any, in the admission of the letters and testimony about the obliterated portions was harmless. See Rule 45A, Ala. R.App. P.
For the above-stated reasons, the appellant's arguments about the admissibility of Drexler's testimony are without merit.

III.
The appellant's third argument is that
"[a]fter a potentially prejudicial newspaper article was published on the front page of the newspaper while the non-sequestered jurors had a three-day weekend during guilt-phase deliberations, the trial court erred when it refused to question the jury as a group or to poll each juror individually to see if any had read that newspaper article, and error also occurred when the trial court refused to, at the minimum, inquire of the whole panel if any juror had heard anything about the case."
(Appellant's brief at p. 21.) On the evening of May 28, 1999, the jury had not reached a decision and requested a recess. The proceedings recessed until the morning of Tuesday, June 1, 1999. On Sunday, May 30, 1999, The Gadsden Times newspaper published an article about the case. On June 1, 1999, the appellant asked the court to poll the jurors to determine whether any of them had read the article or heard anything about the case. After conducting a hearing, the trial court denied the motion, stating:
"Well, I have already told them fourteen times that if they have got any communication or any information about this case, directly or indirectly, or if they talked to anybody or anybody talked to them, that it is improper and they were to report it to me immediately. Now, that is an order. Until somebody tells me that they have, that they have disobeyed the court's explicit instructions, then I'm not going to do anything with this case other than just let the jury deliberate."
(R. 1767-68.) The appellant also raised this issue in his motion for a new trial and during the hearing on the motion.
During the voir dire proceedings, the trial court instructed the potential jurors not to discuss the case with anyone and to avoid any contact with news media. (R. 331, 378-79, 435, 521-22.) After the jury had been impaneled, the trial court instructed the jurors as follows:
"First of all, do not talk to anyone about this case or communicate with anyone about this case directly or indirectly. Do not try to learn anything about this case except as presented in this trial in the courtroom. Avoid all contact with anybody that has anything to do with the case, including family members of *882 either victim or defendant. News media it is very importantI don't know that there will be news media, but I'm sure there will be, radio, T.V., newspaper. You are to avoid any contact with any news media while this trial goes on. Do not discuss this case with anyone, including your own family members, your spouses, or anybody else. And if anybody attempts to talk to you about this case, I want you to report it to me immediately. It is, as I said before, it is improper. In fact it can be a criminal offense to try to communicate with jurors in a trial. So please avoid that. Now, as I told you earlier, you will not be required to be sequestered or kept together during the course of this trial. So it is vitally important since you are not going to be kept together that you avoid any kind of contact or to learn anything about this trial other than what happens in the courtroom."
(R. 606-07.) Also, each time the jury separated, the trial court instructed the jurors not to discuss the case and not to have any contact with news media. Finally, before it allowed the jury to separate on the evening of May 28, 1999, the trial court told the jurors:
"I just want to instruct you now while you are off for the weekend, don't discuss the case or let anybody talk to you, avoid the news media and avoid any kind of contact about this case whatsoever."
(R. 1755.) We presume that the jury followed the trial court's instructions. See Taylor v. State, 666 So.2d 36 (Ala.Crim. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996).
The appellant did not allege, in his motion to poll the jury, his motion for a new trial, or during the hearing on the motion for a new trial, that any jurors had actually read the newspaper article or heard anything about the newspaper article. In Smitherman v. State, 627 So.2d 1116, 1122 (Ala.Crim.App.1993), we held that the trial court did not err when it did not question jurors about a newspaper article published during a recess in the trial because the defendant had not "present[ed] any evidence that any juror even saw the article or that any juror disobeyed the trial court's instructions that the jurors refrain from obtaining information about the case from the news media." In Thomas v. State, 473 So.2d 627, 631 (Ala.Crim.App. 1985), we held:
"Jurors should not be permitted, while in the discharge of their duty, to read newspapers containing statements of fact pertaining to the trial. Leith v. State, 206 Ala. 439, 444, 90 So. 687 (1921). `However, the fact that a juror has read a newspaper in which the case is discussed does not entitle the defendant to an automatic mistrial.' Wiggins v. State, 429 So.2d 666, 668 (Ala.Cr.App. 1983). In the absence of any allegation that any juror actually read the newspaper article, we find no error in the judge's failure to poll the jury to determine whether or not any juror may have read the article."
(Emphasis added.) Because the appellant did not present any evidence that any of the jurors disobeyed the trial court's instructions, the trial court properly denied the appellant's request to poll the jurors about the newspaper article.

IV.
The appellant's fourth argument is that the prosecutor "improperly disparaged, denigrated, and insulted defense counsel when he argued to the jury in closing argument that a statement made by defense counsel was `part of the fairy tale that y'all have been hearing from the defense side.'" (Appellant's brief at p. *883 32.) In judging a prosecutor's closing argument, the standard is whether the argument "`so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
"In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App. 1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App. 1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982)."
Bankhead v. State, 585 So.2d 97, 106-07 (Ala.Crim.App.1989), aff'd. in relevant part, 585 So.2d 112, 127 (Ala.1991), rev'd on other grounds, 625 So.2d 1146 (Ala. 1993).
"`During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.' Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). `In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,' Hooks v. State, 534 So.2d 329, 354 (Ala. Cr.App.1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr. App.1990), aff'd, 590 So.2d 369 (Ala. 1991). `In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.' Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). `To justify reversal because of an attorney's argument to the jury, this court must conclude that substantial prejudice has resulted.' Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr. App.1985) (citations omitted)."
Coral v. State, 628 So.2d 954, 985 (Ala. Crim.App.1992), aff'd, 628 So.2d 1004 (Ala. 1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994). The Alabama Supreme Court has noted that "[o]ne of the most prevalent arguments to a jury is that the position and argument of the adversary is unwarranted, silly, fanciful or illogical." Crook v. State, 276 Ala. 268, 270, 160 So.2d 896, 897 (1962), cert. denied, 276 Ala. 702, 160 So.2d 897 (Ala. 1964). Finally,
"[w]e believe that sidebar remarks criticizing, disparaging or vilifying accused's attorney have no place in the trial of any case. Chatom v. State, Ala. Cr.App., 360 So.2d 1068, cert. denied, Ala., 360 So.2d 1074 (1978); Scroggins v. State, Ala. Cr. App., 341 So.2d 967 (1976), cert. denied, Ala., 341 So.2d 972 (1977); Edgeworth v. *884 State, 54 Ala.App. 93, 304 So.2d 911 (1974). However, an attack on opposing counsel should be distinguished from a verbal assault on the accused. As the Alabama Supreme Court aptly stated in Arant v. State, 232 Ala. 275, 167 So. 540 (1936); `[A] trial is a legal battle, a combat in a sense, and not a parlor social affair.' Our court in Hurt v. State, Ala. Cr.App., 361 So.2d 1163, 1166 (1978), quoted from 99 A.L.R.2d 528 (1965):
"`"The range of a prosecutor's remarks has an important bearing on the extent of their impropriety. When he confines himself to an attack on opposing counsel personally, his remarks may be censurable but they will not usually be held prejudicial to the accused's right to a fair trial."'"
Thomas v. State, 393 So.2d 504, 509 (Ala. Crim.App.1981).
During the State's closing argument, the following occurred:
"Now, I told you in opening how Scott Huie's name came up. I told you that Scott Huie and Geoff West had been seen by an employee there at the store within the last 24 or 48 hours prior to the robbery and that that employee, Donna Mitchell, had made that known to the investigators, and so trying to find some place to startthat's the hardest thing about solving any crime, you have to have a starting place, somewhere to go, and what they do to start with is they look at everything they have got and they try to find some place to start unraveling that string to get to the ball inside. And so this was just one of the strings they were pulling to try to get to it, and the name Scott Huie came up, and I told you he is well known. You know, he has been knowing Todd Entrekin and the sheriff's department for years. He has been in and out of trouble. He has been an informant. I told you that to start with. And that's where they went to. John Floyd got up here and told youand when I tell you it is a promise you remember thisJohn Floyd told you in his opening statement that he was going to prove to you that Scott Huie called Todd Entrekin an hour and a half or two hours before his name ever came up. Y'all remember that? There hasn't been one word said about that, not one. That is part of the fairy tale that y'all have been hearing from the defense side. You have got the statement that was given up here by Donna Mitchell and you have heard her testimony. She told you that she is the one that first brought up the name Scott Huie. Now, if she hadn't, they never would have went to see Scott Huie. They never would have even got to Geoff West if she had not been there and not noticed and no one would have known and this case would have probably gone unsolved, or at least it would have been a lot longer before it was solved. It is not often you have a capital murder case solved within 24 hours from the time it occurs. Think about who told you the straightest during the opening statements. Hold John to that promise."
(R. 1666-67) (emphasis added). The appellant did not object to the prosecutor's statement. Therefore, we will review this issue for plain error. See Rule 45A, Ala. R.App. P. During his opening statement, defense counsel stated:
"After interviewing Donna Mitchell, the State takes the position that all ex-employees were basically suspect. They first make contact with Joseph Scott Huie. They go find him first. But what is real interestingand I want you to listen to this very carefully as the testimony proceedsabout an hour and a half to two hours before they go to see *885 Joseph Scott Huie he pages Todd Entrekin. Scott Huie pages Todd Entrekin. Todd will tell you that when he got the number, he knew who it was. It was one of his main snitches. He picks up the phone, a cell phone, and called Scott Huie back. Now, what happened in the conversation, Todd will tell us about what happened in the conversation. And at that point they don't immediately shut down the scene. None of the investigators stop at that point and go talk to Scott Huie because he just called. They wait and later Chris McCurley, who is now deceased, along with three other officers, go to Scott Huie's home to see him. This is about, as Gary said, and as we know, 10:30 in the morning, some hour and a halftwo hours after the page and the phone call. They talk to Scott Huie."
(R. 627-28.) At trial, Huie testified that he paged Entrekin after he had been interviewed by investigators. Additionally, Entrekin testified that Huie's name came up before Huie paged him. According to Entrekin, Huie first paged him between 10:45 a.m. and 11:00 a.m., after investigators had left for Huie's house. When viewed in the context of the entire proceedings, the prosecutor's statement was a direct comment on the evidence presented by the witnesses at trial and was a reasonable inference that could have been drawn from that evidence. See Coral, supra. Furthermore, the statement was not prejudicial. See Woodall v. State, 730 So.2d 627, 650 (Ala.Crim.App.1997), aff'd. in part, rev'd in part on other grounds, 730 So.2d 652 (Ala. 1998) (holding that the prosecutor's statement that defense's theory was "an attempt to sell the jury `oceanfront property in Arizona'" was not improper or prejudicial); Thomas, 393 So.2d at 508-09 (holding that the prosecutor's statements "`Judge, I think this lawyer needs to have a little lesson in proper evidence'" and that trial counsel had "`lied'" were not prejudicial); Crook, 276 Ala. at 269-70, 160 So.2d at 896-97 (holding that the prosecutor's statements "`You don't listen to some new fangled, disgusting theory that springs out from the minds of the imaginative lawyers'" and "`We aren't supposed to tamper around with any kind of disgusting new fangled theory'" did not constitute reversible error). Accordingly, we do not find any plain error in this regard.

V.
The appellant's fifth argument is that the trial court allegedly deprived him of his right to be tried by an impartial jury by denying his request for individually sequestered voir dire examination of prospective jurors. Specifically, he contends that "[t]he group voir dire rendered impossible any credible inquiry into a potential juror's ability to serve impartially." (Appellant's brief at p. 34.)
"Appellant contends that the trial court erred in failing to grant individually sequestered voir dire of the jury venire. The trial court did permit individual voir dire in several instances but otherwise the jurors were questioned by panels. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021 (Ala.Cr. App.1984), cert. denied, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1988). This discretion is limited, however, by the requirements of due process. United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); Waldrop v. State. Individual questioning may be necessary under some circumstances to ensure that all prejudice has been exposed. United States v. Hurley, 746 F.2d 725 (11th Cir.1984). We have reviewed the record of the voir dire examinations and the *886 entire jury selection procedure in this case and find that the method of empaneling the jury provided reasonable assurance that prejudice would have been discovered if present. We find no abuse of discretion in the trial court's handling of the empaneling of this jury."
Haney v. State, 603 So.2d 368, 402 (Ala. Crim.App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). "Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination." Hallford v. State, 548 So.2d 526, 538 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"A trial court is vested with great discretion in determining how voir dire examination will be conducted, and that court's decision on how extensive a voir dire examination is required will not be overturned except for an abuse of that discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973); Lane v. State, 644 So.2d 1318 (Ala.Cr.App.1994); Harris v. State, 632 So.2d 503 (Ala.Cr.App. 1992), affirmed, 632 So.2d 543 (Ala.1993), affirmed, [513] U.S. [504], 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995). After reviewing the record, we conclude that the trial court did not abuse its discretion in this regard."
Ex parte Land, 678 So.2d 224, 242 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996).
Before the voir dire examination began, the trial court allowed the parties to submit a questionnaire to the prospective jurors. Afterward, it divided the venire into four panels and allowed the parties to conduct extensive group voir dire examination of each of those panels. Finally, in instances in which additional questioning was warranted, the trial court allowed the parties to question prospective jurors individually. The method of the examination and the empaneling of the jury "provided reasonable assurance that prejudice would have been discovered if present." Haney, 603 So.2d at 402. Therefore, the appellant's argument that the trial court deprived him of his right to be tried by an impartial jury when it denied his motion for individually sequestered voir dire examination of prospective jurors is without merit.

VI.
The appellant's sixth argument is that death by electrocution constitutes cruel and unusual punishment. However, courts have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution is not a cruel and unusual method of capital punishment. See Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Williams v. State, 627 So.2d 985 (Ala.Crim.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), rev'd on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). Accordingly, the appellant's argument is without merit.
We have reviewed the guilt-phase proceedings for plain error, and we have not found any. See Rule 45A, Ala. R.App. P. Therefore, we affirm the appellant's conviction. However, the attorney general contends that the trial court's written sentencing order does not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which provides:
"Based upon the evidence presented at trial, the evidence presented during the *887 sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
In its sentencing order, the trial court did not make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any additional mitigating circumstances offered pursuant to § 13A-5-52, Ala.Code 1975. Therefore, we remand this case with instructions that the trial court enter a new sentencing order that complies with the requirements of § 13A-5-47(d), Ala.Code 1975. On remand, the trial court shall take all necessary action to see that the circuit clerk makes due return to this court at the earliest possible time and within 28 days after the release of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH INSTRUCTIONS AS TO SENTENCING.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.

On Return to Remand
BASCHAB, Judge.
The appellant, Geoffrey Todd West, was convicted of capital murder and was sentenced to death. This court affirmed his conviction, but remanded the case with instructions that the trial court enter a new sentencing order that complies with the requirements of § 13A-5-47(d), Ala. Code 1975. See West v. State, 790 So.2d 870 (Ala.Crim.App.2000). In accordance with our instructions, the trial court has submitted an amended sentencing order that complies with § 13A-5-47(d), Ala. Code 1975.
Pursuant to § 13A-5-53, Ala.Code 1975, we must now address the propriety of the appellant's conviction and sentence of death. The appellant was indicted for, and convicted of, capital murder because he murdered a person during the course of a robbery. See § 13A-5-40(a)(2), Ala.Code 1975.
The record does not reflect that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. Specifically, it found that two aggravating circumstances existed: 1) the capital offense was committed by a person under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975, and 2) the capital offense was committed while the appellant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, a robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found that two statutory mitigating circumstances existed: 1) the appellant did not have a significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975, and 2) the appellant was 23 years old at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. Although it did not specifically find that any nonstatutory mitigating circumstances existed, the trial court indicated that it had "considered the aspects of Defendant's character and record presented by the evidence and sentence *888 report." (S.R.30.) The sentencing order shows that the trial court weighed the aggravating circumstances and the mitigating circumstances and correctly sentenced the appellant to death. Its decision is supported by the record, and we agree with its findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's death sentence. After independently weighing the aggravating circumstances and the mitigating circumstances, we find that the death sentence is appropriate.
As required by § 13A-5-53(b)(3), we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant killed the victim during the course of a robbery. Similar crimes are being punished by death throughout this state. See Gaddy v. State, 698 So.2d 1100 (Ala.Crim.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Payne v. State, 683 So.2d 440 (Ala.Crim.App.1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997); Windsor v. State, 683 So.2d 1027 (Ala.Crim.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). Accordingly, we conclude that the sentence was neither disproportionate nor excessive.
Finally, we have searched the record of the penalty-phase proceedings for any error that may have adversely affected the appellant's substantial rights, and we have not found any. See Rule 45A, Ala. R.App.P.
For the above-stated reasons, we affirm the appellant's sentence of death.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.