WISE, Judge.
The appellant, Christopher Anthony Floyd, was convicted of capital murder for intentionally murdering Waylon Crawford during the course of a robbery. See § 13A-5-40(a)(4), Ala. Code 1975. The jury recommended 'by a vote of 11 to 1 that Floyd be sentenced to' death. The trial court accepted the'jury’s recommendation and sentenced Floyd to death. This appeal followed.
Floyd raises a number of issues for this Court’s review. However, our initial review of the record reveals that we must remand this case for additional action by the circuit court so that we may adequately address the merits oil one of Floyd’s claims.
Floyd contends on appeal that his due-process rights were violated when the prosecution used its peremptory chai- *946 ■lenges to remove African-Americans and females from the jury venire, thus violating the rule of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
 In Batson, the United States Supreme Court held that prospective African-American jurors could not be struck from an African-American defendant’s jury based solely, on their race. The Supreme Court later extended its holding in Batson t,o apply to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to civil cases in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based peremptory challenges in J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
“Under the ‘plain error’ doctrine, as enunciated in Rule 45A, [Ala.R.App.P.,] the Court of Criminal Appeals is required to search the record in a death penalty case and notice, any error (ruling or omission) of the trial court, and to take appropriate action, ‘whenever such error has or probably has adversely affected the substantial right of the [defendant],’ in the same manner as if defendant’s counsel had preserved and raised such error for appellate review.”
Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). The plain-error analysis has been applied to death-penalty cases when counsel fails to make a Batson objection. Pace v. State, 714 So.2d 316, 318 (Ala.Crim.App.1995), opinion after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997). For plain error to exist in the Batson context, the record must raise an inference that the State engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.1987).
The State contends that Floyd did not meet his burden of making a prima facie showing of purposeful discrimination and that the' error, if any, does not rise to plain error. A defendant makes out a prima facie case of discriminatory jury se- . lection by “the totality of the relevant facts” surrounding a prosecutor’s conduct during the defendant’s trial. Batson, 476 U.S. at 94, 106 S.Ct. 1712. “Once the defendant makes a prima facie showing, the burden shifts, to the State to come forward with a neutral explanation for challenging” a- targeted class of jurors. 476 U.S. at 97, 106 S.Ct. 1712. While there may be “‘any number”of bases’ on which a prosecutor reasonably may believe that it is desirable to strike a juror who is not excusable for cause ..., the prosecutor must give a ‘clear and reasonably specific’ explanation of his ‘legitimate' reasons’ for exercising the challehges.” 476 U.S. at 98 n. 20,106 S.Ct. 1712. It is then left to the trial court, to determine whether the defendant has established “purposeful discrimination” 476 U.S. at 98 106 S.Ct. 1712. See also Ex parte Trawick, 698 So.2d 162 (Ala.1997) (discussing the relevant factors applicable to allegations of gender discrimination in jury selection).
The record here supplies an inference of racially based discrimination on the part of the State. The initial list of potential jurors consists of 264 individuals. . The strike list indicates that Floyd’s jury was struck from potential jurors no. 1-75. (C. 301-03.) Of the 75 potential jurors on the strike list, 20 were African-American. Although the transcript indicates that the roll of jurors- was called and that all were present, the individual names were not recorded by the court reporter 'so this Court cannot determine the exact number of prospective jurors present for voir dire. *947 The record does, however, indicate that 1 of the 20 African-American prospective jurors was struck during initial voir dire by. the trial court forcause.
The trial court stated during voir dire that Floyd’s jury, was struck frond a panel of 55 prospective jurors. (R. 232.) The record indicates that seven potential jurors were excused from further service, based on their responses during individual voir dire. Of the 7 jurors excused, 4 were white and 3 were African-American, leaving 11 African-Americans.[1] After voir dire concluded, the prosecutor and defense counsel exercised 36 peremptory' challenges to select Floyd’s jury. The State used its 18 strikes to strike 10 of the 11 remaining African-Americans from the ve-nire. Defense counsel struck one African-American. Floyd’s jury thus consisted of 12 white jurors and no African-American jurors. One alternate juror, the State’s final strike, was African-American.
The State contends that no inference exists that the State engagéd in purposeful discrimination because Floyd offered only “bare assertions of discrimination and statistics showing that blaek veniremembers were struck by the prosecutor” (State’s brief at p. 43) and that Floyd’s assertions regarding voir dire of the. complained-of stricken African-American venire-members — that some African-American veniremembers who did not respond during voir dire were struck by the prosecution, while other African-American venire-members who- answered questions in a manner Floyd deemed favorable to the State were also struck by the State — did not constitute a showing of purposeful discrimination. However, as Floyd correctly argued, the State used 55.5% of its strikes to remove 90.9% of the African-American veniremembers. Further, Floyd did not rely on statistics alone, Rather, Floyd correctly noted that four of the stricken veniremembers did not * provide any response in voir dire that would provide a basis for being stricken from the' panel. Floyd also argued that five of the African-American veniremembers struck by the State provided answers during voir dire which, according to Floyd, were favorable to the State. Floyd’s argument' regarding the State’s allegedly improper gender-based strikes is considerably less detailed than his race-based argument. ‘ However, he does aver that the State used 12 of its 18 strikes to remove women from the veni-re'.[2]
The record indicates-.that some of the African-American jurors - as well as some of the white jurors responded to questions posed during voir dire, and that ■some of the prospective jurors did not respond to any questions posed during voir dire. Moreover, it appears that some of the African-American jurors and some of the white jurors who gave similar responses to the questions posed were struck, while other white jurors were not. With regard to the gender-based strikes, although, as noted above, Floyd’s argument is less developed than his race-based claim, the record also indicates similar occurrences regarding striking females while seemingly not striking similarly situated male veniremembers. Although the State may have race-neutral, gender-neutral, and nondiscriminatory reasons for its ac *948 tions, we conclude that it is necessary to remand this case for- a Batson and J.E.B. hearing, in light of the many levels of judicial scrutiny that occur when a defendant is convicted of a capital offense and sentenced to death. As the United States Supreme Court noted in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005):
“[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. 476 U.S., at 96-97, 106 S.Ct. 1712; Miller-El v. Cockrell, 537 U.S. [322] at 339, 123 S.Ct. 1029 [ (2003) ]., It is true that peremptories are often the subjects of instinct, Batson v. Kentucky, 476 U.S., at 106, 106 S.Ct. 1712 (Marshall, J., concurring), and’ it' can sometimes be hard’ to say what the reason is. But when -illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons -he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated, reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of-Appeals’ [] and the dissent’s substitution of a reason for eliminating [the prospective juror] does nothing to satisfy the prosecutors’ burden of stating a racially neutral explanation for their .own actions.”
545 U.S. at 251-52, 125 S.Ct. 2317.
Based on the foregoing, we remand this case to the circuit court with directions that that court hold a Batson and J.E.B. hearing. See Lewis v. State, 24 So.3d 480 (Ala.Crim.App.2006). If the prosecution cannot provide race-neutral reasons for its use of peremptory challenges against African-American jurors and gender-neutral reasons for its use of peremptory challenges against female jurors, then Floyd shall be entitled to a new trial. See Ex parte Bankhead, 585 So.2d 112 (Ala.1991); Pace v. State, 714 So.2d 316 (Ala.Crim.App.1995), opinion after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997); Guthrie v. State, 616 So.2d 913 (Ala.Crim.App.1992).
The circuit.court shall, take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible' time and within 90 days of the release of this opinion. The return to remand shall include a transcript of the remand proceedings conducted by the circuit court and the circuit court’s specific findings of fact. Because it is necessary to remand this case, we pretermit discussion of Floyd’s remaining claims.
REMANDED WITH DIRECTIONS.
Baschab, P.J., and McMillan, Shaw, and Welch, JJ., concur.

On Return, to Remand

WISE, Judge.
Christopher Anthony Floyd was convicted of capital murder for intentionally murdering Waylon Crawford during the course of a robbery. _ See § 13A-5-40(a)(4), Ala. Code 1975. The jury recommended by a vote óf 11 to 1 that Floyd be sentenced to death. The trial court accepted the jury's recommendation and -sentenced Floyd to death. This appeal followed. •
One of the issues raised on appeal by Floyd was that his due-process rights were violated when the prosecution used its peremptory challenges to remove African-Americans arid females from the jury veni-re, thus violating Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d. 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). On September 28, 2007, this Court re *949 manded this case.for .additional action by the circuit court with regard to this claim. Floyd v. State, 190 So.3d 940 (Ala.Crim. App.2007). The circuit court has complied with our instructions and on return to remand has submitted a transcript of the Batson and J.E.B. hearing conducted by the circuit court, together with a copy of the circuit court’s specific findings of fact regarding Floyd’s Batson and J.E.B. claim.

Facts

The State’s evidence tended to show that at the time.of his death, the victim, Waylon Crawford, and his wife Melinda owned and operated Waller’s Grocery, a small grocery store in Houston County. The evidence further indicated that on the evening of February 15, 1992, while working at the store, Crawford was shot in the chest and throat with a shotgun and died as a result of his injuries.
Melinda Clements testified that she was married to the victim at the time of his death. She stated that Crawford typically carried a wallet in his pocket and that he usually kept currency in his pocket but not in his wallet. According to Clements, she had opened the store on the morning of February 15, 1992, and left around 6:00 or 6:30 that evening because of a medical ■condition. She stated that when she left for the evening, there was approximately $200-$400 in cash in the wooden cash drawer behind the counter.[1] She stated that she received a telephone call at approximately 8:30 that evening telling her to return to the store.[2] . .
Ricky Vann testified that at the time of the murder, he was an investigator with the Houston County Sheriffs Department. According to- Vann, :the victim’s body was discovered lying-against the front door of the store at approximately 8:30 p.m. The testimony further indicated that, investigators did not discover a wallet or any currency in the victim’s pockets, nor was there any currency in. the wooden cash drawer behind the counter.
Dr. Alfredo Paredes, a forensic pathologist with the State of Alabama, testified that he conducted the autopsy on the victim. According to Dr. Paredes, the victim was shot in the chest and neck area with a shotgun. Dr. Paredes stated that he observed more than 20 entrance wounds inflicted by individual "pellets discharged from a single shotgun blast. He further testified that the shot cup or wadding was lodged in the victim’s'throat.
. Eddie Roberts, a correctional officer at Easterling Correctional Facility, testified that in ¡September 2004 Floyd told him that he was “having suicidal thoughts” and wanted to speak with,a supervisor. (R. 547.) 'Officer .Roberts stated that Floyd then admitted to him that he had killed someone. According to Officer Roberts, Floyd claimed that he committed the murder while he was drinking and,on drugs,to get money and that he. watched the individual die.
Keith Cook, an investigator with the Houston County Sheriffs Department, testified that he interviewed Floyd on September 27, 2004, at which time Floyd confessed to the murder. In that confession, Floyd told Investigator Cook that he had borrowed- a truck from Paul Wayne John *950 son, driven to Waller’s Grocery, entered the store wearing a mask and brandishing a shotgun, and demanded money. Floyd further claimed that Crawford grabbed the shotgun, that the shotgun discharged, that Crawford was struck by the blast, and that Floyd then took money from the cash register and fled. He further testified that Floyd provided details consistent with the crime scene, such as the location of the victim’s body. Investigator Cook also stated that Floyd claimed to have taken approximately $400 in the murder-robbery. In his confession, Floyd stated that after He fled the store he went to his grandmother’s house and changed clothes. During the statemént Floyd claimed to have ingested alcohol and cocaine before the murderrrobbery, that he did not intentionally shoot Crawford, that he did not think he even had his hand on the trigger, and that he did not think the shotgun was even operational. Floyd further indicated in his statements that he had disposed of the shotgun by placing it in an automobile crusher in Panama City, Florida. Floyd spoke with authorities a number of times following his initial confession and claimed responsibility for the robbery-murder during each interview.[3] -
Robert Floyd, Jr., testified for the defense that he was Floyd’s cousin. According to Robert, on the night of the murder, he was at his house, which he stated was approximately four or five miles from Waller’s Grocery, and that his brother, Paul Wayne Johnson, borrowed his pickup truck around 7:00 or 7:45 p.m„ and re-, turned approximately 45. minutes later. Robert stated that Johnson’s .410 shotgun was in the truck at the time Johnson borrowed the truck. Robert conceded on cross-exaniination that it could' have been as late as 8:30 p,m. when Johnson borrowed the truck. Robert further conceded that he was smoking marijuana on ■ the evening of the murder, and that he did not see any blood on Johnson’s clothing or the truck.
Robert Charles Dixon testified for the defense that he met Paul Wayne Johnson several years earlier when they were both incarcerated at Fountain Correctional Facility. In 2000, Dixon wrote letters to the district attorney’s office and police investigators indicating that he had information in Crawford’s murder. Dixon claimed that Johnson had confessed to committing the offense.
Johnson testified that he had used alcohol and crack cocaine on the evening of the murder. He stated that he was unsure as to whether his .410, shotgun was in .the house or in his brother’s truck on the evening of the murder. He admitted to borrowing his brother’s truck on the evening of the murder to go to where his girlfriend, who he claimed was coming to pick him up, had gotten lost. Johnson stated that he, returned to his brother’s a few minutes later and that he later went with his girlfriend to a nightclub. According to Johnson, sometime after the murder he eventually traded the shotgun to a drug dealer in Malone, Florida, for $40 worth of crack cocaine. Johnson denied telling anyone he had committed the murder. •
The jury found Floyd guilty of the- capital offense charged in the indictment.-' A separate sentencing hearing was held. See § 13A-5-46, Ala.Code 1975. The jury recommended, by a vote of 11 to 1, that Floyd be sentenced to death. A presen- *951 tence report was then prepared as required by § 13A-5-47, Ala.Code 1975, and the circuit court held a separate sentencing hearing. After hearing testimony, the circuit court sentenced Floyd. .to death. This appeal, which is automatic in a case involving the death penalty, .followed. See § 13A-5-53, Ala.Code 1975.

Standard of Review

. Floyd has been sentenced to death. According to Rule 45A, Ala.R.App.P., this Court must review the record of the proceedings for “plain error.”. Rule 45A, Ala. RApp.P., states:
“In ail eases in which the death penalty has been imposed, the Court qf Criminal Appeals shall notice any plain error ■or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In describing this standard of review, this Court has stated:
“ ‘The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2dl (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously a£fect[s] the fairness;"integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev’d on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993).’ ”
Smith v. State, 795 So.2d 788, 797-98 (Ala.Crim.App.2000), quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999).
A number of the specific, arguments raised on appeal were never brought to the circuit court’s'attention.. However, the “failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes cm appeal.” Brooks v. State973 So.2d 380, 387 (Ala.Crim.App.2007) (opinion on application fob rehearing).

Issues

I.
 Floyd first argues that the trial court erred in denying his motion to suppress his statements to the police. Specifically, Floyd contends that his statements were due to be suppressed because they were taken while he, was in custody at Easterling Correctional, Facility, they .were made while h.e was in the presence of two deputies with the Houston County Sheriffs Department, he only had a 9th-grade education, a,nd he told the deputies that he had been under considerable mental anguish. . , , .
“It has long been .the law that a confession is prima facie involuntary and inadmissible and that, before a confession-may be admitted into evidence, the burden- is upon the State to establish voluntariness and a Miranda predicate. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990). A two-pronged test is used to determine whether an accused’s statement is admissible. First, the trial court must determine whether the , accused was informed of his Miranda rights. before he made the statement. Second, the trial court must *952 determine whether the- accused voluntarily and knowingly waived his Miranda rights before making- his statement. Holder v. State, 584 So.2d 872, 878 (Ala.Crim.App.1991); Carpenter v. State, 581 So.2d 1277, 1278 (Ala.Crim.App.1991).”
Jones v. State, 987 So.2d 1156, 1163-64 (Ala.Crim.App.2006).
Here, the trial court conducted a hearing on Floyd’s general motion to suppress the statements as having been obtained without a knowing, intelligent, voluntary waiver of his Miranda rights. The evidence at the suppression hearing indicated that Floyd was incarcerated at the time of each interview with authorities. There is no indication, however, that Floyd’s status as an inmate affected the voluntariness of his statements. Further, the circuit court found the statements to be admissible based on Investigator Cook’s testimony at the suppression hearing.
Investigator Cook testified at the suppression hearing that Floyd was advised of his Miranda rights before each interview. According to Investigator Cook, Floyd did not appear to be under the influence of alcohol or narcotics and indicated that he understood his rights and was freely and voluntarily waiving those rights. Investigator Cook further testified that neither he nor anyone else in his presence threatened Floyd in order to get him to make a statement or offered him any promises as to the outcome of the investigation or any other hope, reward, or inducement if he agreed to speak with them. There is no indication that Floyd did not understand his rights, nor is there any discussion as to “mental anguish” that Floyd now includes' for the first time on appeal.
We have reviewed the tapes of Floyd’s interviews as well as the transcript of the trial proceedings. The evidence and testimony support the trial court’s findings that the statements were admissible.
II.
' Floyd next argues that the trial court erred in denying his motion for a judgmént of acquittal. Specifically, Floyd contends that, excluding his confession, the State proved only that the victim had died as the result of a shotgun blast.
“ ‘In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept' as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.’” Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). “ ‘The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.’ ” Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App.1997), quoting O’Neal v. State, 602 So.2d 462, 464 (Ala.Crim.App.1992). “ When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case],to the jury, and, in such a case, this court will not' disturb the trial court’s decision.’” Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App. 1990). “The role of appellate courts is not to say what the facts are. Our role ... is to judge whether, the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.” Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
Despite Floyd’s desire to exclude his confession, his statements to investigators were properly before the jury and, therefore, are properly considered in answering the question of whether the State present *953 ed a prima facie case of robbery-murder.[4] Thus; the evidence,- viewed in the light most favorable to the State, indicated that the victim’s body was found lying against the inside of the front door of his grocery store and that the victim had been shot in the chest and neck with a shotgun. Additional evidence indicated that several hundred dollars was missing from the- cash drawer. The . evidence further indicated that Floyd had- confessed to shooting the victim in the chest-with a shotgun and to taking money from the store.' In his statements to authorities; Floyd admitted that he went to the store intending to rob the victim of money. Certain details of the offense, including Floyd’s description of the timeline of events, the layout of the store, and the location of the victim’s body, were consistent with details uncovered at the-scene.- 'Thus-, after examining the record in this case, we find that the State presented legally sufficient • evidence to support the trial court’s decision to deny Floyd’s motion for a- judgment of acquittal on the ground of insufficiency of the evidence. Any questions as to whether the killing was intentional or unintentional, and discrepancies in certain details such as the color of the truck and the location and type of container holding the money were for the jury to resolve, and, the jury having resolved those questions adversely to Floyd, this Court will not go behind the jury’s verdict to reweigh the evidence.
III.
Floyd next argues that the trial court erred in denying his motion for a new trial. Specifically, Floyd argued that he was entitled to a new trial based on what he contended was the newly discovered testimony of a witness who claimed to have seen Paul Wayne Johnson in bloody clothing the night of the murder.
At the hearing on Floyd’s motion for a new trial, Dorothy Dyson testified that she was working at the Red Carpet Lounge on the night of February 15, 1992. She stated that she walked a friend out to the parking lot at approximately 9:00 p.m. at which time she observed Paul Wayne Johnson talking with another man, whom she identified as James Granger. According to Ms. Dyson, Johnson’s shirt was bloody. She testified that she asked Johnson-about his- clothes' and he told her he had been in a fight. Ms. Dyson testified that she then told Johnson that she did not “see any scratches on [him] or bruises,” and that Johnson did not respond but merely looked down at the ground. (R. 1360.)
Ms. Dyson testified that she learned of Crawford’s murder when she stopped at a local gasoline service station after leaving work at 3:00 a.m., approximately six hours after seeing Johnson in the parking lot. Ms..Dyson stated that she knew Johnson as a customer at the lounge, that she knew Waylon Crawford irom shopping at his grocery store, that she had known Floyd “all his life” (R. 1372), that Floyd’s mother had been her close friend for a number of years, and that Floyd’s aunt was her daughter-in-law.
“[I]n order to establish the necessity for a new trial based on newly discovered evidence, the appellant must prove: (1) that the evidence was discovered after the trial; (2) that the evidence could .not have been discovered prior to trial by due diligence on the part of the movant; (3) that the evidence is material to the issue of the-appellant’s guilt; (4) that the evidence is not merely cumulative or *954 impeaching; and (5) that the evidence would probably change the outcome if a new trial was granted.” -
Gillespie v. State, 644 So.2d 1284, 1289 (Ala.Crim.App.1994). Additionally, “a trial court’s decision to deny a motion for a new trial will not be. disturbed on appeal unless there is a clear showing of abuse of discretion, and this Court will indulge every reasonable presumption in favor of the correctness of the trial court’s, ruling.” Mims v. State, 816 So.2d 509, 515 (Ala.Crim.App.2001). Finally, “ ‘a condition to the granting of a new trial on the basis of newly discovered evidence.is that the trial court must believe the evidence present; ed.’ ” Travis v. State, 776 So.2d 819, 847 (Ala.Crim.App.1997), quoting McMillian v. State, 594 So.2d 1253, 1264 (Ala.Crim.App.1991), remanded, 594 So.2d 1288 (Ala.1992), rev’d on return to remand on other grounds, 616 So.2d 933 (Ala.Crim.App.1993).
Here, the trial' court thoroughly questioned Ms. Dyson as to why she did not come forward with her information until after Floyd had been convicted and sentenced. In its order denying Floyd’s motion for a new trial, the trial court stated:
“[Floyd] presented one witness, Ms. Dorothy Dyson. Shé testified that on the day of the murder, February 15, 1992, she was a waitress at a local lounge. She recalled seeing Paul Wayne Johnson at approximately 9:00 p.m. in the' parking lot of the lounge. She noticed that Johnson’s shirt was bloody and asked him why. He told her that he ‘had "been in' a fight. She stated to him thát she didn’t see any scratches or marks- on him. At this point Johnson looked down at' the ground. It was not until the'next morning that she learned of the 'murder of '[Waylon] Crawford..
“She further testified that she did not make the connection between Christopher Anthony Floyd and Paul Wayne Johnson until Floyd’s trial and sentencing for capital murder. After sentencing she went to Judy Dyson’s house, who happened to be [Floyd’s] aunt, and told her of the chance meeting with Paul Wayne Johnson at the lounge some 13 years ago. She then gave an affidavit to [Floyd’s] attorney which was admitted into evidence as Defendant’s exhibit A.
“The gist of [Floyd’s] motion for a new trial is based primarily on what he characterizes as newly discovered evidence. While this evidence could be beneficial to -the defense it is not without its problems. . It is indeed trufe that the defense theory was that Paul Wayne Johnson had committed the murder and was initially a suspect in the case. However, ■ the Court must look at Ms. Dyson’s testimony carefully insofar as she is closely associated with [Floyd’s] family. Additionally, it was extremely fortuitous that she comes forward after the trial alleging- that she did not learn of the events and association until [Floyd’s] trial for capital murder even though the case appeared in the media on many occasions prior to. trial. After- learning of the situation she does not come forward until much later.
“The Court is reluctant to place much weight on the testimony of. Ms. Dyson. The evidence, if-believed, does not prove that Paul Wayne Johnson killed anyone. Further, the Defendant Floyd confessed to the murder. Additionally, the Court determines that the evidence presented by Ms., Dyson is not newly, discovered evidence but, rather newly disclosed, evidence. In this regard see Watkins v. State, 601 So.2d 187 (Ala.Crim.App.1992), cert. denied, 1992 Ala. Lexis 947 (Ala.1992).”
(C. 386-88.)
It is clear to' this Court from the trial court’s questioning of the witness at the *955 hearing and the trial court’s statements at the conclusion of the hearing, and in the trial court’s order denying the motion that the trial court viewed with great scepti-cism the contention-that Ms. Dyson’s, testimony was truly newly discovered evidence. The record supports the circuit court’s findings, and we find no abuse of the trial court’s discretion in denying the motion for a new trial.
IV.
Floyd also contends that the trial court erroneously admitted the videotape of the crime scene into evidence. Specifically, he claims that the videotape was gruesome, cumulative, and more prejudicial than probative. Because Floyd did not object to the admission of State’s exhibit 11, we review this claim for , plain error. See Rule 45A, Ala.R.App.P. .
“ ‘The same rule applies for videotapes as for photographs: “The fact that a photograph is gruesome and ghastly is no reason, for excluding it, if relevant, even if the photograph may. tend to inflame the jury.” Siebert v. State, 562 So.2d 586, 599 (Ala.Crim.App.1989), aff'd, 562 So.2d 600 (Ala.1990), quoting Walker v. State, 416 So.2d 1083, 1090 (Ala.Crim.App.1982), See also Ward v. State, 814 So.2d 899 (Ala.Cnm.App.2000). Generally, ‘[a] properly authenticated video tape recording of the scene of the crime constitutes competent evidence’ and ‘is admissible over the defendant’s objections that the tape was inflammatory, prejudicial, and cumulative.’ Kuenzel v. State, 577 So.2d 474, 512-13 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991). ‘Provided, that a proper foundation is laid, the admissibility of .videotape evidence in a criminal trial is a matter within tbe sound discretion of the trial judge.’ Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Crim.App.1986).”
Brooks v. State, 973 So.2d 380, 393 (Ala.Crim.App.2007).
State’s exhibit 11 is a videotape of the crime scene. The tape is approximately 6 minutes and 40 seconds long and includes both video and audio. The tape appears to have been taken from a handheld video camera, and the person tape-recording the scene walks around the store during the recording. The vast majority of the tape consists of.panning around the store and zooming in on assorted grocery items, the counter, the, cash, drawer-, blood spatter and the pool of blood on the floor,, and the victim’s body. The final portion of the tape is exclusively focused on the victim’s body and the bloody floor as the emergency technicians begin to roll the body over. At that time one of the technicians points out. the shotgun packing lodged in the victim’s throat, and there is a brief discussion-of that matter.
The burden was on the State to prove not only that Waylon Crawford was dead, but that he was murdered by Floyd during the course of a robbery. Because there were no eyewitnesses to the Crime, details such as the location of Crawford’s body inside the store were necessary to corroborate Floyd’s confessions. -The location of the cash drawer and the victim’s body were relevant and admissible as showing the nature and extent of the victim’s wounds, as showing the shotgun packing lodged in the victim’s skin that the medical examiner extrapolated on during his testimony, and as corroborating and lending credibility to Floyd’s confession to the murder-robbery.[5] Therefore, we find no error, much less plain error, in the admission of State’s exhibit 11.
*956 V.
Floyd argues that the State engaged in a pattern of improper argument during closing argument of the guilt and penalty phases of his trial.
In reviewing claims of prosecu-torial misconduct arising out of improper argument, this Court has followed the following principles:
■ “A reviewing court must evaluate allegedly improper comments made by the prosecutor in the context of the entire proceeding in which the comments were made. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). ‘ “In juáging a prosecutor’s closing argument, the standard is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)).
“‘In reviewing allegedly, improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App.1980), cert. denied, 404 So.2d 100 (Ala.1981). Moreover, this Court has also held that statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr.App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982).’
“Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App.1989), aff'd in relevant part, remanded on other grounds; 585 So.2d 112, 127 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992).”
Lockhart v. State, 715 So.2d 895, 902-03 (Ala.Crim.App.1997) [quoted with approval in McWhorter v. State, 781 So.2d 257, 817-18 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121. S.Ct. 1612, 149 L.Ed.2d 476 (2001)). Further,
“ ‘[d]m±ig closing argument, the prosecutor,- as well as defense counsel, has a right to present his 'impressions from the evidence,-if reasonable, and may argue every legitimate-inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So(2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L,Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 *957 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must .conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cir.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993).
A.
Quoting portions of the prosecutor’s closing argument of the guilt phase of his trial, Floyd argues that the prosecutor attempted to inflame the jury, vouched for the credibility of Paul Wayne Johnson, and used the prestige and integrity of his office to imply that he had additional knowledge other than the evidence presented to the jury. Because Floyd did not object to the allegedly improper remarks, we review his claim under the plain-error standard.
In DeBruce v. State, 651 So.2d 599, 610-11 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994), this Court stated:
“A distinction must be made between an argument by the prosecutor personally vouching for a witness, thereby bolstering the credibility of the witness, and an argument concerning the credibility of a witness based upon the testimony presented at trial. ‘[Pjrosecutors must avoid making personal guarantees as to the credibility of the state’s wit-' nesses.’ Ex parte Parker, 610 So.2d 1181 (Ala.1992). See Ex parte Waldrop, 459 So.2d 959, 961 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).
“ ‘ “Attempts to bolster a witness by vouching for his credibility are normally improper and error.” ... The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness’ credibility.... This test may be satisfied in two' ways. First, the prosecution may place the prestige of the government behind the witness, by making explicit personal assurances of the witness’ veracity.... Secondly, a prosecutor -may implicitly vouch for the witness’ veracity by indicating that information not presented to the jury supports the testimony.’
“United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983), cert. denied, 465 U.S. 1034, 104 S.Ct. 1304, 79 L.Ed.2d 703(1984),”
Accord Wilson v. State, 777 So.2d 856, 903 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Price v. State, 725 So.2d 1003, 1030 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).
As part of his closing argument, the prosecutor., essentially, stated that Paul Wayne Johnson had not been indicted because he was not involved in Crawford’s murder, and that the decision not to prosecute Johnson was the proper course of action by the police department, the sheriffs department, and the district attorney’s office.
After carefully reviewing the closing arguments of both the prosecutor and defense counsel, we conclude that the prosecutor’s comments did not constitute vouching, for the. State’s case. Instead, it appears that most of the prosecutor’s remarks were an explanation of. the State’s case and his impressions based on the evidence. Therefore, those comments do not constitute -error. See Boyd v. State, 715 So.2d at 841. Further, his rebuttal remarks about Johnson constituted a reply-in-kind to defense counsel’s arguments regarding the defense’s theory that Johnson, not Floyd,' had killed Crawford. “ ‘A prosecutor has a right'based on fundamen *958 tal fairness to reply in kind to the argument of defense counsel.’” Johnson v. State, 823 So.2d 1, 47 (Ala.Crim.App.2001) (quoting DeBruce v. State, 651 So.2d at 609).
We have carefully reviewed the prosecutor’s entire closing argument during the guilt phase of Floyd’s trial, paying particular attention to the context of the prosecutor’s remarks quoted in. Floyd’s brief. Based ■ on that- review, it is clear that the prosecutor’s remarks at the guilt phase of Floyd’s trial were made in the heat of debate, were proper coniments on facts in evidence, were in reply to various remarks made during defense counsel’s clqsing argument, and were not improperly designed to inflame the passions of the jury. Therefore, no basis for reversal exists.
B.
Quoting portions of the prosecutor’s argument at the penalty phase of his trial, Floyd argues that the prosecutor’s argument was an improper attempt to inflame the passions of the jury and suggested that death was an appropriate penalty because if the death ' penalty was not imposed Floyd might escape and kill again.
We have carefully reviewed the prosecutor’s entire closing argument during the penalty phase of Floyd’s trial, paying par-ticúlar attention to the context of the prosecutor’s'remarks'-quoted in Floyd’s brief. Based on that review, it is- clear that the prosecutor’s remarks at the penalty phase of Floyd’s trial were made in the heat of debate, were proper comments on facts in evidence, were in reply to vaiious remarks made during defense counsel’s closing argument, and were not improperly designed to inflame the passions of the jury; Therefore, no basis for reversal exists, . ■
VI.
Floyd next contends that the trial court erroneously allowed the State to introduce, prior to presenting any evidence of the corpus delicti,. evidence indicating that Floyd had confessed to committing the offense. Specifically,' Floyd argues that it was improper for the State to elicit testimony from -its first witness, Eddie Roberts, indicating-that Floyd had claimed to have shot someone. Because Floyd did not object to the complained-of testimony, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
. It is well settled that “[u]n-der Alabama law, a confession is, not admissible unless there: is independent evidence tending to prove the corpus delicti.” Slaton v. State, 680 So.2d 879, 897 (Ala.Crim.App.1995), aff'd 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997) (citing Spear v. State, 508 So.2d 306 (Ala.Crim.App.1987)).
“It has been the rúle in Alabama that the State must offer independent proof of the corpus delicti of the charged offense to authorize the admission of a defendant’s confession or inculpatory statement. Robinson v. State, 560 So.2d 1130, 1135-36 (Ala.Cr.App.1989); see C. Gamble, McElroy’s Alabama Evidence, 200.13 (5th ed. 1996). ‘ “The corpus de-licti consists of two elements: ‘(1) That a certain result has ’ been produced, '... and (2) that some person is' criminally responsible for the act.’”' Johnson v. State, 473 So.2d 607, 608 (Ala.Cr.App.1985),] (quoting C. Gamble, McElroy’s Alabama Evidence § 304.01 (3d ed. 1977)).’ Spear v. State, 508 So.2d 306, 308 (Ala.Cr.App.1987). ‘“Positive, direct evidence of the corpus delicti is not indispensable to the admissions of confessions.” ’ Bracewell v. State, 506 So.2d 354, 360 (Ala.Cr.App.1986), quoting Ryan v. State, 100 Ala. 94, 14 So. 868 (1894). ‘The corpus delicti may be established -by circumstantial evidence.’ *959 Sockwell v. State, 675. So.2d 4, 21 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519. U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).”
Maxwell v. State, 828 So.2d 347, 357 (Ala.Crim.App.2000).
Initially, we note that Floyd’s argument encompasses only Officer Roberts’s .testimony that Floyd had told him that he was suicidal and that he had “shot a man one time.” (R. 547.) According to Officer Roberts, Floyd never identified the person he claimed to have killed, only that he had shot the person because he had been drinking and was under the influence of drugs at the time and needed money. That testimony did not encompass the subsequent interviews between Floyd and Investigator Cook in which Flóyd specified the details of the offense.
Based on the facts of this case, we conclude that although the facts and circumstances surrounding the offenses, may be inconclusive without Floyd’s confession, “they do tend to prima facie show the corpus delicti of [the offense].” See Bush v. State, 695 So.2d 70, 119 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). The State presented sufficient evidence to establish the corpus delicti of the crime. The State proved that Waylon Crawford was dead and that the cause of death was injuries he sustained from a gunshot to the chest and neck inside the store he operated with his wife. Additionally, the State presented evidence indicating that a few hundred dollars had been taken from the cash drawer of the victim’s store. Further, when Floyd’s confession is considered along with the other evidence presented by the State, there was legally sufficient evidence establishing the corpus delicti of the capital offense of murder during the commission of a first-degree robbery. See Irvin v. State, 940 So.2d 331 (Ala.Crim.App.2005). The victim’s wife.testified that there was a-few hundred dollars in the cash drawer when she left' the store a few hours before the victim was killed, and that she had previously had discussions with the victim in which the victim stated that he would not give a robber any money if he were ever robbed. The. evidence - further indicated that the victim had been shot once in the chest and neck-with a shotgun and that his body was found against the front door, of the store, •
We find that the facts of the case and reasonable . inferences from those facts support and corroborate Floyd’s confession, in whidi he stated that the victim refused to acquiesce when Floyd demanded his money and that the victim’s body was against the front door of the store. Thus, the State sufficiently proved, the corpus delicti of the offense. The fact that evidence of Floyd’s admissions was presented at trial before the presentation of the aforementioned evidence establishing the corpus delicti did not result in reversible error.
VII.
Floyd next argues that the trial court improperly admitted into evidence State’s exhibit 7, two diagrams purportedly made by Floyd during his statements, to the police because, he claims, the State failed to establish the proper evidentiary predicate for the admission of the diagram based on “identification, chain of custody, and lack of .Miranda., warnings as to the statements taken and the. diagram being made — ” (Floyd’s brief at.p. 39.) Floyd concedes that this issue should be reviewed for plain error because, .although trial counsel objected to the admission of the exhibit, the objection was on different grounds than the ground being argued on appeal. . s
*960 Initially, with regard to Floyd’s assertion that the State did no.t comply with the mandates of Miranda, we note simply that as discussed more fully in Part I of this opinion, the State sufficiently established a Miranda predicate.
With regard to Floyd’s identification and' chain-of-custody assertions, we note that the Alabama Supreme Court has established the following chain-of-custody.analysis to be applied:
“This opinion sets forth an analysis to be followed in deciding whether a proper chain of custody has been shown. We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala.1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id, In order to establish a proper chain, the State must show to a ‘reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain.’ McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988). Because^ the proponent of the item of demonstrative evidence has the burden of showing this reasonable probability, we require that the proof be shown on the record with regard to the various elements discussed below.
“The chain of custody is composed of ‘links.’ A ‘link’ is anyone who handled the item. The State must identify each link from the time the item was seized. In order to show a proper chain of custody, the record must show each link and also the following with regard to each'link’s possession of the item: ‘(1) [the] receipt of the item; (2) [the] ultimate disposition of the item, i.e., transfer, destruction, or retention; and' (3) [the] safeguarding and handling of the item between receipt and disposition.’ Imwinklereid, The Identification of Original, ■Real Evidence, 61 Mil. L. Rev. 145,159 (1973).
“If the State, or any other proponent of demonstrative evidence, fails to identify’a link or fails'to show for the record any one of the three criteria as to each link, the.result is a ‘missing’ link, and the item is inadmissible. If, however, the State has shown each link and has shown all three criteria as to each link, but has done so with circumstantial evidence, as opposed to the direct testimony of the ‘link,’ as to one or more criteria or as to one or more links, the result is a Veak’ link. When the link is Veak,’ a question of credibility and weight is presented, not one of admissibility.”
Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991). Further, “ ‘[a]rticles or objects which relate to or tend to elucidate or explain issues or form a part of the transaction in question are admissible in evidence when duly identified and shown to be in substantially the same condition as at the time of the occurrence.’ ” C. Gamble, McElroy’s Alabama Evidence, § 319.02 (4th ed. 1991). Davis v. State, 647 So.2d 52, 55 (Ala.Crim.App.1994).
“Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever.a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any *961 break in the chain of custody concerning the physical evidence.” • :
§ 12-21-13, Ala.Code 1975. -
Here, Investigator Cook identified one page of State’s exhibit 7 as a diagram drawn by Floyd during his September 27, 2004, interrogation of Floyd, and the second page of the exhibit as a diagram drawn by him and Floyd together during the October 1, .2004, interrogation. Investigator Cook , stated that the exhibit had not been marked, altered, or changed in any way other than the addition of defense counsel’s initials, which were added when the diagrams had been provided for the ■defense’s review as a part of discovery. Thus, Investigator Cook sufficiently identified the exhibit, and his testimony further indicated that the exhibit was in the same condition and was not substantially different than when first drawn during the interviews. (K. 744-47.)
Finally, we note that .Investigator. Cook, when testifying about other exhibits related to his interviews with Floyd, i.e., the Miranda waiver sheet and the tape-recordings of the assorted statements, provided additional testimony about the care, custody, and bontrol of those'exhibits and indicated that the materials had been maintained together; although he did not specifically reference the diagrams that constituted State’s exhibit 7 when he made that assertion, it logically follows that the exhibits were among the materials related to the interviews Investigator Cook was describing. -
Moreover,' even if the State failed to provide a textbook chain of custody, the predicate laid sufficiently identified the diagrams and established that the diagrams had not been changed, and further there is no indication that the diagrams are not what they were purported to be. In short, we have carefully reviewed Floyd’s claim and we conclude that the trial court did not abuse its discretion in admitting the exhibit and further, that Floyd’s rights were not affected by the trial court’s admission of the exhibit. No plain error exists with regard to this claim.
VIII..,,
Floyd argues that the State used its peremptory strikes in a discriminatory, manner to-remove prospective jurors based on their race and gender in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
After the jury was struck, the trial court asked whether the State or the defense had any motions, and no Batson objection of any kind was made. Accordingly, we review this claim for plain error. Rule 45A, Ala.R.App.P.
In Batson, the United States Supreme Court held that prospective African-American jurors could not be struck from an African-American defendant’s jury based solely on the jurors’s race. The Supreme Court later extended its holding in Batson to white defendants in Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); to civil cases in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991); to defense counsel in criminal cases in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); and to gender-based peremptory challenges in J.E.B. v., Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
“Under the ‘plain error’ doctrine, as .enunciated in Rule 45A, [Ala.R.App.P.,] the Court of Criminal Appeals is ¡required to search the record in a death penalty case and notice any error (ruling or omission) of the trial court, and to take appropriate action, ‘whenever such error has or probably-has adversely affected the substantial right of the [de *962 fendant],’ in the same manner as if defendant’s counsel had preserved and raised such error for appellate review.”
Ex parte Johnson, 507 So.2d 1351, 1356 (Ala.1986). The plain-error analysis has been applied to death-penalty cases when counsel fails to make a Batsbn objection. Pace v. State, 714 So.2d 316, 318 (Ala.Crim.App.1995), opinion-after remand, 714 So.2d 320 (Ala.Crim.App.1996), reversed in part on other grounds, 714 So.2d 332 (Ala.1997). For plain error to exist in the Batson context, the record must raise an inference that the State engaged in “purposeful discrimination” in the exercise of its peremptory challenges. See Ex parte Watkins, 509 So.2d 1074 (Ala.1987).
In Ex parte Branch, 526 So.2d 609 (Ala.1987), the Alabama Supreme Court announced the standard a reviewing court should use when evaluating whether a Bat-son violation has occurred. The Court stated:
“The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider ‘all relevant circumstances’ which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“1. Evidence that the ‘jurors in question share[d] only this one characteristic — their ■ membership in the group— arid that in all other respects they [were] as heterogeneous as the eommu-nity as a whole.’ [People v.] Wheeler, 22 Cal.3d [258], 280, 583 P.2d [748], 764, 148 Cal.Rptr. [890], 905. For instance ‘it may be significant that the persons ■challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,’ Wheeler, 22 Cal.3d at 280, 583 P.2d at, 764, 148 Cal.Rptr. at 905, n. 27, indicating that, race was the deciding factor.
“2/ A pattern .of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
“3. ’ The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed,2d 759 (1965) ].
“4. , The type and manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr) at 905.
“5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
“6. Disparate treatment of members of the jury venire with,the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, [503] So.2d at 352 and 355.
“7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain *963 response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
“8. Circumstantial evidence of-intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
“9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.”
526 So.2d at 622-23. When reviewing a trial court’s ruling on a Batson motion, this court gives deference to the trial court’s ruling and will reverse that court’s decision only if it is clearly erroneous; Yancey v. State, 813 So.2d 1, 3 (Ala.Crim.App.2001); Farrior v. State, 728 So.2d 691 (Ala.Crim.App.1998); Merriweather v. State, 629 So.2d 77 (Ala.Crim.App.1993); Nance v. State, 598 So.2d 30 (Ala.Crim.App.1992); and Jackson v. State, 594 So.2d 1289 (Ala.Crim.App.1991).
As previously discussed, on original submission this Court concluded that the record supplied , an inference of inconsistent strikes by the prosecution, and we remanded Floyd’s case for additional findings regarding Floyd’s Batson and J.E.B. claim. The prosecutor and defense counsel exercised 36 peremptory challenges to select Floyd’s jury. The State used its 18 strikes to strike 10 of the 11 remaining African-Americans and 12 of the 18 remaining females from the venire. Defense counsel struck one African-American and seven females; Floyd’s jury consisted of 6 white male jurors and 6 white female‘jurors; none of the jurors were African-American. One of the alternate jurors was an African-American female (the State’s final strike), - and the other two alternate jurors were .white males.
On remand, the court conducted an- evi-dentiary hearing concerning the merits of Floyd’s Batson and J.E.B. claim.. During the hearing, the prosecutor stated that his general practice- in capital cases was to make a notation on the; strike list as to his initial impression of each prospective juror; he further stated that he then would adjust- that initial rating based on the prospective juror’s responses, or lack of response, to the questions posed to the veni-re by the prosecution, the-defense, and the court.. The prosecutor also indicated that he considered race- and gender-neutral factors such as the prospective juror’s general demeanor and attentiveness or -lack thereof during voir dire, the manner in which the prospective juror , responded to questions posed to him or her during voir dire, whether the prospective juror appeared to have difficulty understanding the court’s instructions or the questions posed to the juror by the court or the attorneys, the juror’s age, place of employment or lack of employment, and apparent physical ability. The prosecution then offered the following reasons for striking 10 of 11 African-American prospective jurors:
Jurar no. 19: The State’s eleventh strike. She was struck because she was not attentive during jury qualification or voir dire, and failed to make eye contact with the State but was “nodding in agreement with the defense.” (Supp. R. 64.) .
Juror no. 28: The State’s first strike. She was struck because she had 32 bad-check cases and her probation had been revoked.: (Supp. R, 64.) The prosecutor also .noted that she was. in the same age range as Floyd. (Supp. R. 74.)
Juror no. 38: The State’s fourth strike. He was struck because. he had been convicted of disorderly conduct, because he knew a'potential witness who was rumored to have been involved in the commission of the offenses Floyd was *964 charged with committing, and. because a member of law enforcement had reviewed-the list of prospective jurors and indicated that he would be a bad juror for the State. (Supp. R. 64-65.)
Juror no. ⅛3: The State’s second strike. He was struck because he had two convictions for harassment and had approximately 12 -traffic tickets with the City of Dothan. (Supp. R. 65.)
Juror no. ⅛6: The State’s sixth strike. She was struck because she had six convictions and her brother' had felony convictions, because she at one point during voir dire questioned, the veracity of law enforcement testimony, and because she was- familiar with members of the district attorney’s office because that office had prosecuted her- and her brother. (Supp. R. 65-66.)
Juror no. 51: The State’s eighteenth and final strike; this juror served as an • alternate juror. -She was struck because she was 77 years of age and due to her demeanor during voir-dire and the length and complexity of the case, the prosecution had concerns about her ability to serve as a juror in the case.
Juror no. 57: ■ The State’s seventh strike. She was struck because she had convictions for theft and negotiating -worthless negotiable instruments.
Juror no. 58: The - State’s sixteenth strike. She was struck because she did not respond to any questions during voir dire and the prosecution did not know anything about her. (Supp. R. 67-68; 75.)
Juror no. 59: The State’s third strike. She was struck because she- initially indicated that she could’ not -vote for the death penalty and that she was personally opposed to capital punishment, and she vacillated when questioned by the trial court. ■ (Supp. R. 69.)
Juror no. ■ 60: The State’s eighth strike. She wds struck because she knew the defense attorneys, members of the district attorney’s office, the forensic pathologist who performed the autopsy on the victim; the prosecutor believed she was “too familiar with everybody involved.” (Supp. R. 69-70.) She was also struck because her religious beliefs impacted her ability to sit in judgment of the accused. (Supp. R. 71-72.)
The prosecutor further stated that he had considered the lone African-American prospective juror struck by the defense, prospective juror no. 30, to be “an excellent juror for the State” based on his rating system. (Supp. R. 60.)
In addition to the reasons offered for striking the eight African-American female prospective jurors listed -above, the prosecution offered the following, reasons for. .striking four white female prospective jurors:
Juror no. 5: The State’s twelfth strike. She was struck because of her age. (Supp. R. 74.) Thé proseeútor further stated that he could not recall the specific reasons, but that his initial impression was that she would not make a good juror for the State. (Supp. R. 103.)
Juror no. 23: The State’s tenth strike. She was struck because she failed to respond to any' questions during voir dire and because the prosecutor’s initial impression of her was that she would not bé a strong juror for the - State. (Supp. R. 73; 101-02.)
Juror no. 35; The State’s fifteenth strike. She was struck because although the prosecutor’s initial impression was that she would be “okay,” she failed to respond to any questions during voir, dire and because she appeared to be approximately, the same age range as Floyd. (Supp. R. 74-75; 106-07.) Juror no; 70: The State’s thirteenth strike. She was struck because she was *965 approximately the same age as Floyd. (Supp. R. 74; 105.)
The prosecutor further stated that he had determined during voir dire that female prospective jurors nos. 32 and 42, both of whom served on the jury, would be good jurors and he had written ■ “okay” on his strike sheet; that he had determined that female prospective juror no. 8, who also served on the jury, would be an excellent juror for the State; and that he had, determined female prospective jurors nos. 18 and 62, both of whom were struck by the defense, would be good jurors based on, his rating system. (Supp. R. 104-05.),
The prosecution offered into evidence its. strike list containing the prosecutor’s notations about assorted prospective jurors, a list showing each prospective juror’s prior jury service and any criminal charges, and' a strike list containing notations by law enforcement about various jurors and his impression as to whether they would be a good juror for the State.
Defense counsel was given an opportunity to rebut the prosecutor’s reasons for striking these jurors. Defense, counsel submitted a legal memorandum setting out a list of cases from Houston County involving Batson objections, including five instances where this Court had reversed convictions from the Houston Circuit Court based on Batson violations. Next, defense counsel addressed the prosecutor’s reasons for striking 10 African-American jurors in Floyd’s case. Defense counsel argued that although the prosecutor claimed that a number of the challenged strikes were based upon assorted offenses for which the contested veniremembers or their family members had been convicted, many of those convictions were not in the record or in documents available to the defense. Additionally, defense counsel argued that the prosecution failed to ask follow-up questions to a number of venire-members with regard to the reasons being given for .striking them from the' jury. Finally, with regard to the prosecution’s assertion that several of the prospective jurors were struck because of their age, he noted that those veniremembers ranged in age from as young as 28 years old to as old as 77 years. ,
. Defense counsel further argued that air though the prosecution claimed to have struck prospective juror no. 67, a Caucasian male, because of traffic tickets, a number of the juro.rs seated on the jury had assorted traffic violations; defense counsel then asserted that the prosecution had articulated “tickets” as reasons for a number of the challenged strikes. (Supp. R. 85.) However, we note that prospective juror no. 67 was neither African-American nor female. Furthermore, the prosecution did not indicate that any of.,the contested strikes were based solely upon traffic violations. Rather, many of the legal transgressions articulated by the State as to the contested veniremembers were for, felony or misdemeanor convictions: juror no. 28 (32 bad-check cases and probation revocation); juror no. 38 (disorderly conduct conviction); juror no. 46 (six convictions and a brother with felony convictions); juror no. 57 (convictions for theft and negotiating worthless -negotiable instruments). Although the prosecution did state that juror no. 43 had 12 traffic cases, he also referenced two convictions for harassment as a reason for exercising a strike .as to this prospective juror.
At the conclusion of the evidentiary hearing, the court1 took the case under advisement. Thereafter, the circuit court entered a written order making written findings of fact concerning the prosecutor’s reasons for striking exercising its peremptory strikes to remove 10 African-American jurors and 12 female jurors. The court concluded that the prosecutor had given race- and/or gender-neutral reasons *966 for striking jurors no. 19, 23, 28, 35, 38, 43, 46, 51, 57, 59; 60, and 70. We agree.
The court also concluded that the State had been unable to articulate race- or gender-neutral reasons for striking jurors no.' S' and 58, but that failing to remember its reasons for a strike was not tantamount to' discrimination; the court further found that it would be inconsistent for the -prosecution to have removed those two jurors' for improper reasons, particularly in light of the fact that the prosecution was áwáré that the trial court, as a matter of routine, required- the State to articulate its reasons for strikes had -the defense merely made a timely Batson motion. Although we express no opinion as' to the trial court’s rationale for finding that the State had articulated race- -and gender-neutral reasons for' striking-jurors no. 5 and 58, we note that our review of the supplemental record indicates that the prosecution did articulate the following reasons for these two strikes. -The prosecutor stated' that he-struck juror no. 5 because of her age and because his initial impression of her was that she would not make a favorable juror for the State. In light of the prosecutor’s detailed explanation at the Batson hearing on remand as-'to his method of striking jurors — that -he first gathers -information regarding their previous jury service, and any legal transgressions, and solicits recommendations from law enforcement, that he then makes a notation on his jury strike list as to his initial impression of the juror at voir dire, and that he makes modifications of that initial impression based on the prospective juror’s responses, conduct, demeanor, etc., during voir dire before deciding how to exercise his strikes — we find no indication in the record that, juror no. 5 was struck for an improper reason or that the strike resulted in disparate treatment.
'Similarly, with regard- to prospective juror no. 58, the prosecution stated that she was struck because she did not respond to any questions during voir dire. Wé note that the prosecution articulated nonre-sponsiveness as a ground for striking jurors no.’ 19, 23, and 35. The defense argued that jurors no. 8 (Caucasian female) and 21 (Caucasian male) served on the jury despite failing to respond to any questions during voir dire. The prosecution noted that juror no.. 8 had served on a jury in 1996 that voted to convict the accused in a criminal case.' In light of the fact that a number of convictions from Houston County have been reversed as a result of Bat: son violations,[6] and in light of the fact that this Court rémandéd this 'case for the trial court to conduct a Batson and J.E.B. hearing, the trial court was certainly aware of the potential for abuse. After careful review of the facts and circumstances in this case and -relevant legal aúthbrity, and with appropriate consideration for the heightened scrutiny in a case such as this where the defendant has been sentenced to death, the strike of juror no. 58 simply did not evidence disparate treatment based on the record before this’ Court. Based on the foregoing, we conclude that the trial court’s ruling was not clearly erroneous. Accordingly, no basis for reversal exists ás to this claim.
IX.
Floyd argues that the trial court improperly failed to consider the statutory mitigating circumstance of no significant criminal history... See § 13A-5-51(1), AIa.Code 1975. Specifically, Floyd *967 contends that the trial court improperly considered criminal activity that, occurred after the commission of the robbery-muiv der in this case. Floyd attempts to analogize this statutory mitigating offense in § 13A-5-51(l) with the Habitual Felony Offender Act contained in § 13A-5-9, Ala. Code 1975, in that, .he argues, only activity for which, there has been a conviction before the commission of the current offense is eligible for consideration. However, such an analogy is improper.. Section 13A-5-39, Ala.Code 1975, provides:
“As used in this article, these, ter-ms shall be defined as follows:
[[Image here]]
“(6) PREVIOUSLY CONVICTED and PRIOR CRIMINAL ACTIVITY. As used in Sections '■ 13A-5-49(2) and 13A-5-51(l), these terms refer to events occurring before the date of the sentence hearing.”
Thus, the trial court’s use of Floyd’s criminal history, including the fact that he was already serving three life sentences at the time of the sentencing hearing in this case, as an aggravating circumstance is proper under Alabama law. See Ray v. State, 809 So.2d 875 (Ala.Crim.App.2001).
X.
Floyd next argues that the trial court erroneously allowed evidence before the jury that Floyd was serving three sentences of life imprisonment. Specifically, Floyd asserts that the prosecutor elicited testimony to that effect from two witnesses and also referenced that fact during closing arguments, and that the information was not relevant and served only to inflame the jury.
Floyd first cites the prosecutor’s questioning of Robert Floyd, Jr., who is Floyd’s cousin and who was called as a witness for the defense. On direct examination, during questioning by the defense about Floyd’s reputation as being . nonviolent, Robert responded that,he did not believe Floyd had committed the murder because he only knew Floyd to.have previous legal problems for- writing bad checks. On cross-examination, the prosecutor had Robert clarify his earlier response and ■ then reminded. Robert that he had also testified that Floyd had stolen an automobile — to which-Robert stated that that inci-dént also involved a bad check. Robert testified that he was unaware of Floyd having any convictions fob impersonating a police officer: The jprosecutor then asked whether ■ Robert had “heard about [Floyd’s] other life sentences for theft, for stealing” to which Robert responded “Well, I know he had three life sentences.” (R. 847.) The prosecutor began asking Robert, “So you heard really more than just his — ” (R. 847), at which time defense counsel objected and the trial court heard arguments on the objection outside of the hearing of the jury. After discussion, in which defense counsel indicated that if Floyd testified he was ¡going to elicit testimony to that effect anyway, the trial court instructed the prosecutor to limit his questioning to the specific trait of violence rather than Floyd’s general character; the trial court noted that the defense’s objection to the line of questioning was untimely but offered to give a curative instruction if the defense wanted, an offer-defense counsel declined.
Floyd also cites to the testimony of Paul Wayne Johnson, another of Floyd’s cousins who testified as witness for the defense; according-to the defense’s theory of the case Johnson, not Floyd, committed the murder. Defense counsel vigorously questioned Johnson in a ¡manner designed to elicit testimony that he had committed the murder by establishing that Johnson was a violent person and that he had admitted to assorted inmates that he had committed the murder, accusations Johnson repeatedly denied.. During direct examination, the *968 defense questioned Johnson about conversations he had had with Floyd about the murder while the two were briefly incarcerated together; Johnson stated that he asked why Floyd lied to the police and told them he was involved, that Floyd initially denied implicating Johnson but then claimed the authorities had forced him to name Johnson. Johnson then opined that Floyd “tried to blow the door down to get the sentences he got on him off.” (R. 890.) On cross-examination, the prosecutor asked Johnson about his conversations with Floyd; the following exchange then occurred:
“[Prosecutor]: ... The question — in those conversations, the time, you had a 15-year sentence to do, didn’t you?
“[Johnson]: Yes, sir.
“[Prosecutor]:, And he had life sentences .to do, didn’t he?
“[Johnson]: Yes, sir, he did.
“[Prosecutor]: And that’s the time he started talking or telling people more openly or more that you were the person who did the killing of Waylon Crawford, in other words, to help get his sentences reduced, right?
“[Johnson]: That’s my opinion of it, sir.”
(R. 923.) On redirect-examination, defense counsel attempted to elicit testimony to portray Johnson as trying to get Floyd to take the blame for the murder:
“[Defense counsel]: Let me ask you this: You said he had a life sentence and you have a 15-year sentence. , ..
“[Johnson]: He had three life sentences.
“[Defense counsel]: Right. So you told him — you told him with your three life sentences, you ain’t never going to get out anyway, they are not going to bother you on this murder, I get ■ out in 15 years, don’t let them stick it on me-. It’s not going to hurt you.”
(R. 925-26.)
Finally, during his closing remarks to the jury, both after the guilt phase of the trial and again at the sentencing phase, the prosecutor referenced the fact that Floyd was serving, three sentences of life imprisonment.
In Ex parte Minor, 780 So.2d 796 (Ala.2000), the Alabama Supreme Court held that it was plain error where the trial court failed to sua sponte instruct the jury that evidence of the defendant’s prior convictions introduced for-impeachment purposes could not be considered as substantive evidence of the defendant’s guilt of the crime for which he was now on trial. See also Snyder v. State, 893 So.2d 482 (Ala. 2001). However, the holdings in Minor and Snyder have been repeatedly held to apply only to those cases in which the defendant testified and the evidence of pri- or convictions was admitted for impeachment purposes, and then on a case-by-case basis. See, e.g., Johnson v. State, 120 So.3d 1119 (Ala.2006); Ex parte Martin, 931 So.2d 759 (Ala.2004); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002).
Here, Floyd did not testify, and the evidence was not introduced for impeachment purposes. Rather, evidence that Floyd was serving three life sentences went to the defense’s assertion that Paul Wayne Johnson, who was serving a 15-year sentence for an unrelated conviction, had committed the murder and that he asked Floyd to take the blame because Floyd was already serving sentences of life imprisonment that would likely prevent his release from prison anyway. Further, we note that Floyd contributed to the lack of instruction by declining the trial court’s offer to issue a curative instruction when the testimony was first elicited by the prosecution. It is well settled that
“ ‘ “[u]nder the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.” Phillips v. State, 527 So.2d 154, 156 (Ala.1988). “The doctrine of invited error applies to *969 death-penalty cases and operates to waive any error unless the error rises to the level of plain error.” Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).’”
Sharifi v. State, 993 So.2d 907, 936 (Ala.Crim.App.2008), quoting Robitaille v. State, 971 So.2d 43, 59 (Ala.Crim.App. 2005). We find no plain error in the trial court’s failure to issue a limiting,,instruction to the jury as to the proper use of the complained-of evidence.
XI.
Floyd also argues that the trial court erred in allowing Dr. Paredes to testify that the victim’s injuries were caused by a .410 shotgun based on the findings of another expert who did , not testify. Specifically, Floyd contends that this testimony was violative of the Confrontation Clause principles espoused, in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
Initially we note that Floyd objécted to Dr. Paredes testifying about the gauge of shotgun; however, that objection was founded on the grounds that Floyd was not competent to testify as a firearms expert, not the hearsay and Confrontation Clause assertions Floyd now advances on appeal. Thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
In Crawford v. Washington, the United States Supreme Court held that the admission of a witness’s out-of-court statement that is testimonial under the Confrontation Clause is barred unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the. statement is deemed reliable by, the trial court. We note that Dr. Paredes’s testimony is mixed in terms of his own experiences with shotguns and cases involving shotguns and in terms of the findings of Joe Saloom— Saloom, who was characterized as a state firearms expert, did not testify and there is no indication in the record' as to his availability. ’Even assuming, without deciding, that Crawford is applicable to the facts of this ease, we note that this Court has traditionally applied a harmless-error analysis to alleged violations of the Confrontation Clause. See King v. State, 929 So.2d 1032 (Ala.Crim.App.2005), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also Perkins v. State, 897 So.2d 457 (Ala.Crim,App.2004); and Smith v. State, 898 So.2d 907 (Ala.Crim.App.2004). Here, even if the complained-of testimony was error, it was harmless beyond a reasonable doubt. The gauge of shotgun, although certainly relevant to help lend trustworthiness to Floyd’s confession, was not such a critical matter as-to require a reversal. Therefore, no plain error exists which would necessitate a reversal of this case.'
XII.
Last, as required by § 13A-5-53, Ala. Code 1975, we address the propriety of Floyd’s conviction for capital murder and his sentence of death. Floyd was indicted and contacted of murdering'Waylon Crawford during the course of committing a robbery, an offense defined as capital by §§ 13A-5-40(a)(4), Ala.Code . 1975, and punishable by death.'
The record reflects that Floyd’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(l), Ala. Code 1975.
The circuit court found that the aggravating circumstance that the murder was committed while Floyd was engaged in a first-degree robbery outweighed the mitigating circumstances and warranted that Floyd be sentenced to death. With regard to statutory mitigating circumstances, the trial court found that although Floyd was competent to stand trial and at the time of *970 the offense, there was some evidence indicating that he was under the-influence of drugs and alcohol at the time of the murder, see § 13A-5-51(6), Ala.Code 1975; the court also found that Floyd was 19 at the- time he committed the murder, see § 13A-5-51(7). The court found the following nonstatutory mitigating circumstances:
“[Floyd’s] aunt, Wendy Harper, testified that Christopher Floyd grew up in a broken home without a strong father influence. [Floyd] was two years of age when his father left his mother. His parents parted on bad circumstances. He tried to establish a relationship with his father but the father would not have anything to do with him. Christopher Floyd’s mother had a difficult time financially being a single parent and raising her children. There were numerous stepfathers in the home over a period of years and he never established a good relationship with these stepfathers. His .mother and various stepfathers drank alcohol to excess. His mother had been physically abused in front of him and he himself had been verbally and physically abused on occasions. He started drinking at an early age. On many occasions he had to take care of his little brother. His stepfáther put his mother in the hospital because of domestic violence. She had never known Christopher Floyd to be in a fight and believed he could be a good inmate in prison. They moved a lot when he was young. He was married-' one time for two years and had no children.”
(C. 376.) - - The circuit court’s findings are supported by the record.
> Section 13A-5-53(b)(2), Ala. Code 1975, provides that this Court must independently weigh the 'aggravating cir-eumstaflces arid the mitigating circumstances to determine the propriety of Floyd’s sentence of death.. After an independent weighing we are convinced that death 4s the appropriate sentence.
Section 13A-5-53(b)(3), Ala.Code 1975, provides that this Court must address whether Floyd’s sentence of death was disproportionate to the penalties imposed in similar cases. Floyd’s death sentence is neither. “In fact, two-thirds of the death sentences imposed in Alabama involve' cases of- robbery/murder.” McWhorter v. State, 781 So.2d 257, 330 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). See, e.g., Beckworth v. State, 946 So.2d 490 (Ala.Crim.App.2005), cert. denied, 549 U.S. 1120, 127 S.Ct. 936, 166 L.Ed.2d 717 (2007) (burglary/murder); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004) (burglary/murder); Wynn v. State, 804 So.2d 1122 (Ala.Crim.App.2000), cert. denied, 804 So.2d 1152 (Ala.2001), cert. denied, 535 U.S. 972, 122 S.Ct. 1440, 152 L.Ed.2d 383 (2002) (robbery/burglary/murder).
Finally, we have searched this record for any error that may have adversely affected Floyd’s substantial rights and have found no error, plain error under Rule 45A, Ala. R.App.P., preserved error, or other error.
Floyd’s capital-murder conviction and his sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
BASCHAB, P.J., and McMlLLAN and SHAW, JJ., concur. WELCH, J., dissents, with opinion.

. Thus, based on the initial jury list , and the strike list, of the 20 African-American jurors, a total of 5 were struck for cause and 11 remained in the pool of potential jurors. - It is unclear what happened to the remaining 4 African-American potential jurors on the jury list and initial strike list.

. The record further indicates that Floyd used 7 of his 18 strikes to remove females from the venire. Floyd's jury consisted of six female jurors and six male jurors. One of the three alternate jurors, the State’s final strike, was female.

. Clements later stated.that there could have been as much as $500 in the cash drawer.

. Clements did not indicate who called her and told her to return to the store, nor did she explain what the caller told her other than that she needed to return to the store. She testified, after receiving that call and as she was preparing to go to the store, that she telephoned a mutual friend, Gerald Morgan, and asked him to go to the store because she believed Crawford was having heart problems, and Morgan lived closer to the store than Clements.

. Floyd continued to maintain that he committed the robbery-murder, but added or changed details of the events. In one statement he claimed that he was hired to commit the murder. In another statement he recanted the portion of the statement wherein he claimed to have disposed of the shotgun in an automobile crusher and instead claimed to have thrown the shotgim into a river.

. In Part VI of this opinion we address Floyd’s argument that his confession was improperly admitted into evidence before any independent evidence of the corpus delicti of the robbery-murder.

. Floyd does not argue that the videotape was not authenticated or that the proper ‘foundation was not laid.

. See, e.g., McCray v. State, 738 So.2d 911, 914 (Ala.Crim.App.1998); Ashley v. State, 651 So.2d 1096, 1101 (Ala.Crim.App.1994); Andrews v. State, 624 So.2d 1095, 1099 (Ala. Crim.App.1993); Williams v. State, 620 So.2d 82, 86 (Ala.Crim.App.1993); Roger v. State, 593 So,2d 141, 142 (Ala.Crim.App.1991).